1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    United States of America,      )
                                    )
4                 Plaintiff,        )  CR 16-01663-001-TUC-JGZ(BPV)
                                    )
5            vs.                    )
                                    )  Tucson, Arizona
6    Richard Corrie Beals,         )  September 14, 2016
                                    )  1:31 p.m.
7    _____Defendant.____ )

8

                        TRANSCRIPT OF PROCEEDINGS
9                          DETENTION HEARING

10

                  BEFORE THE HONORABLE ERIC J. MARKOVICH
11                   UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:
          Michael R. Lizano
14        U.S. Attorney's Office
          405 West Congress Street, Suite 4800
15        Tucson, AZ 85701

16   For the Defendant:
          Edward H. Laber
17        Laber & Laber
          33 N. Tucson Blvd.
18        Tucson, AZ 85716

19

20

     Transcribed by:
21        Cindy J. Shearman
          405 W. Congress, Suite 1500
22        Tucson, AZ 85701
          520-205-4286

23

24              Proceedings were digitally recorded
             Transcript prepared by transcriptionist
25

I N D E X

WITNESS                                                    PAGE

JAMES FURNER

Direct examination by Mr. Lizano                              4
Cross-examination by Mr. Laber                               15
Redirect examination by Mr. Lizano                          32

JAMES R. McKREE

Direct examination by Mr. Laber                             44
Cross-examination by Mr. Lizano                             53


KAROL R. WALDREN

Direct examination by Mr. Laber                             59
Cross-examination by Mr. Lizano                             72
Redirect examination by Mr. Laber                           80
Recross examination by Mr. Lizano                           83



E X H I B I T S

IDENTIFIED                    OFFERED          ADMITTED

Gov 5                           39               42
Gov 6                           39               39
Gov 7                           39               39
Gov 8                           14               14

Def A                           68               68
Def B                           71               71
Def C                           71               71

```
1                      P R O C E E D I N G S

2            (Call to order of court, 1:31 p.m.)

3            CLERK:  Matter CR 16-1663, United States of America

4    versus Richard Corrie Beals, before the court for detention

5    hearing.

6        Counsel, please state your appearances.

7            MR. LIZANO:  Good afternoon, Your Honor.  Michael

8    Lizano for the United States.  And to let the court know, we do

9    have our first witness on the phone ready to testify today,

10   Mr. James Furner.

11           THE COURT:  Okay.  Good afternoon.

12           MR. LABER:  Good afternoon, Your Honor.  Edward Laber

13   on behalf of Mr. Beals, who's present with me in custody.

14           THE COURT:  Okay.  Good afternoon, Mr. Laber.  Good

15   afternoon, Mr. Beals.

16       Okay.  So, Mr. Lizano, if you want to come to the podium

17   and you can start questioning.

18       I guess we'll just do the oath telephonically, Allison.

19           CLERK:  Okay.

20           JAMES FURNER, GOVERNMENT WITNESS, WAS SWORN.

21           MR. FURNER:  Your Honor, this is Mr. Furner.  I cannot

22   hear all that's being said over the phone but I do testify to

23   give the truth, the whole truth, nothing but the truth under

24   the pains and penalties of perjury.

25           THE COURT:  Okay.  Yeah, that's what you were asked,
```

DIRECT EXAMINATION - JAMES FURNER                    4

```
 1    but can you hear me?
 2            THE WITNESS:  Yes, I can, Mr. Lizano.
 3            THE COURT:  Okay.  It's actually -- this is the judge
 4    but Mr. Lizano's going to start questioning you now.
 5            THE WITNESS:  Okay.  Sorry, Your Honor.
 6            THE COURT:  No problem.
 7                         DIRECT EXAMINATION
 8    BY MR. LIZANO:
 9    Q.  So, Mr. Furner, can you hear me?  I'm standing at a podium
10    with the microphone.  Do you have any trouble hearing me?
11    A.  I hear you fine, thank you.
12    Q.  Okay.  Great.  All right.  So if you could just for the
13    record state and spell your first and last name.
14    A.  James, J-a-m-e-s, Furner, F, as in fox, u-r-n-e-r.
15    Q.  Okay.  And, Mr. Furner, are you currently employed?
16    A.  I'm recently retired.
17    Q.  Okay.  And so where did you retire from?
18    A.  I retired as a deputy chief United States probation officer
19    for the US District Court in the District of Utah.
20    Q.  And is that in Salt Lake City?
21    A.  It is.
22    Q.  Okay.  And how did you -- how long did you work for US
23    probation in Salt Lake City?
24    A.  Since about September of 1993.
25    Q.  And I think you mentioned it, but what was your position
```

1    before you retired from the US probation office in Salt Lake?

2    A.  Deputy chief US probation officer.

3    Q.  Do you know a man by the name of Richard Beals?

4    A.  I do.

5    Q.  How did you come to know Mr. Beals?

6    A.  I'm guessing sometime in 2010, give or take a year, Judge

7    Bruce S. Jenkins, senior US district judge, asked me to pull

8    Mr. Beals' file from archives and to review it.  The judge also

9    asked me to send Mr. Beals a letter notifying him that I would

10   be reviewing his file.

11       And so, in that process, once Mr. Beals received that

12   letter, he began communicating with me.  That was initially, as

13   I recall, over the telephone and eventually included email

14   correspondence, or I received email correspondence from

15   Mr. Beals, I should say.

16   Q.  Okay.  And what -- if you could just kind of summarize it,

17   what in your view was the purpose of why you were getting into

18   contact with Mr. Beals?

19   A.  My understanding at the time that relationship initiated

20   was that Mr. Beals had been somewhat prolific in communicating

21   to the judge and other people via email and I believe that the

22   judge wanted me to become the focus of Mr. Beals' conversation

23   or communication with the court or on his -- on his matter and

24   to redirect his attention from the judge.

25   Q.  Okay.  And so is it fair to say that essentially you were

1   tasked with kind of keeping tabs on Mr. Beals to a certain

2   extent?

3   A.  To communicate with him, to listen to him, and in part to

4   determine whether I determined or whether I thought any of his

5   emails represented a threat to anybody or if he was on his way

6   to Utah to potentially visit the judge or do harm to the judge

7   or any court employees.

8   Q.  So were there concerns about potential for violence on the

9   part of Mr. Beals?

10  A.  From what the judge represented, I would say yes.  There

11  was enough concern that the judge wanted somebody monitoring

12  him to determine if they thought Mr. Beals was going to act out

13  on some of his qualified threats.

14  Q.  And, Mr. Furner, so it kind of sounds like the judge had

15  asked you to review his file and get involved in this way.  Was

16  this part of your official duties as a US probation officer?

17  A.  It was because Judge Jenkins asked me to do that.

18  Mr. Beals' case had been adjudicated many years before, I

19  believe in the late 1980s, early 1990s.  That case had

20  terminated, I don't know if it was by expiration or revocation,

21  and I'm talking about what I believe is supervised release.

22  And so there was no jurisdiction by the probation office over

23  that case that I was aware of.

24  Q.  Okay.  But this is essentially you were doing because the

25  judge asked you to do it?

1    A.  That is correct.

2    Q.  All right.  Did you open a private email account

3    specifically to communicate only with Mr. Beals?

4    A.  I did and I'd like to indicate how that came about.

5    Initially, Mr. Beals and I were corresponding via my official

6    government email.  At some point, I believe 18 to 24 months

7    into those communications, I stopped receiving emails from

8    Mr. Beals.  As I recall, Mr. Beals either called or I called

9    him and he indicated he'd been sending those emails but I had

10   not received them.  My IT manager could not give an explanation

11   of why those emails would stop.  There hadn't been a rule

12   change to preclude those emails from arriving from Mr. Beals.

13   There was nothing that he could explain why those would stop.

14   And so I created an email account exclusively for Mr. Beals to

15   communicate to me, yes.

16   Q.  Okay.  And you kind of alluded to it, but how long would

17   you say that you've been in communication with Mr. Beals?

18   A.  I'm thinking 2009, 2010 is when it may have begun.  And I

19   don't have access to the government email account any longer

20   but I do have access to that private email account.  And by my

21   records, those correspondence began August 23rd of 2011 and

22   have continued up to and I think about the time of his arrest.

23   Q.  Okay.  So it's safe to say for several years?

24   A.  Indeed, yes.

25   Q.  Okay.  And you've also already mentioned it, but it sounds

1   like your communication with him was not only by email but

2   there was also some phone communication; is that correct?

3   A.  Yes.  Fairly frequent phone conversation but the phone

4   calls were not as frequent as the emails.

5   Q.  And this might be an impossible task, but just a rough

6   ballpark, how many emails would you say that you received from

7   Mr. Beals over the years?

8   A.  Funny you should ask.  I tallied those and since

9   August 23rd of 2011, I received in excess of 450 emails from

10  Mr. Beals.

11          MR. LABER:  I -- I just -- was that total or that was

12  just in one year?

13  BY MR. LIZANO:

14  Q.  Well, yeah, so let me clarify that.  You said in excess of

15  450 emails since August of 2011.  Is that what you're saying?

16  A.  That is correct.  And I can break it down by year if you

17  need.

18  Q.  That's all right.

19  A.  Okay.

20  Q.  Okay.  So on most of the emails that you were receiving

21  from Mr. Beals, were you one of many recipients?

22  A.  I believe so, yes.  There were many other email addresses

23  on there.

24  Q.  And how would you describe, Mr. Furner, the general tenor

25  of the emails that you were receiving from Mr. Beals over the

1    years?

2    A.  Mr. Beals was extremely frustrated, agitated, angry, and,

3    as the years went on, I believe even tormented by what he

4    believes is injustices exercised on him in his case in the

5    criminal justice system in the District of Utah.  He believes

6    that his conviction was wrongful, by my recollection, and he

7    was seeking anybody's attention who could help overturn that

8    conviction or set aside the jury verdict, something to pardon

9    him of the conviction so that he could move on with his life.

10   He was truly upset and angry and I believe tormented by what he

11   believes were wrongs exercised against him by the judicial

12   system, and then it expands beyond that.

13   Q.  And based upon your interactions with him, I mean, is it a

14   fair statement to say that he essentially views himself as kind

15   of a victim of a large conspiracy?  Is that fair or not?

16   A.  That is a fair -- yes, that is fair.

17   Q.  And, you know, in connection with this, is it also fair to

18   say that Mr. Beals believes that Judge Jenkins has some sort of

19   unique position to exonerate him or make his problems go away?

20   Is that fair or would you characterize it differently?

21   A.  I think that's a fair assessment.  He frequently would say:

22   All Jenkins has to do is with a stroke of a pen overturn the

23   conviction and let me go.

24   Q.  All right.  So as we already talked about, it appears that

25   you -- you received many, many emails from Mr. Beals over the

1   years.  I know you don't have -- obviously you're testifying

2   telephonically, so I'm going to reference what's already been

3   admitted into evidence as Exhibit 1 in this case, which is an

4   email dated July 25th, 2014.

5        Do you have a copy of that email in front of you?

6   A.  I do.

7   Q.  Okay.  And this is the one, "I'm going to kill Neil Crist

8   someday unless I see some justice."

9        Do you see that in the, I guess it's the last paragraph of

10  the email.

11  A.  Yes, I believe the sentence begins, "Mr. Rawlings, I'm

12  going to kill Neil Crist someday unless I see some justice."

13  Yes, that paragraph.

14  Q.  So obviously since you've got a copy in front of you, it's

15  fair to say that you received that email, that's one of the

16  emails that you received from Mr. Beals?

17  A.  It is, yes.

18  Q.  And at the time he sent it in 2014?

19  A.  Yes, I believe I got it the day he sent it, July 25th,

20  2014.

21  Q.  Okay.  I'm going to move on to another email which has

22  already been admitted into evidence as Exhibit 2, which is

23  dated April 29th, 2015:  I've never hurt anyone in my life but

24  maybe it's time to start shooting you Mormon mother fuckers.

25       Did you -- do you have a copy of that email in front of

1   you?

2   A.  I do.  And the subject title line is:  Letter to US

3   Attorney Nominee John Huber.

4   Q.  Yes, correct.  So -- and is it fair to say that you also

5   received this email around the time that it was sent by

6   Mr. Beals?

7   A.  Yes.

8   Q.  Then the third one I want to bring to your attention is

9   dated -- it's on or about August 26th, 2016, where there's

10  written, I guess it's on the last page of the email:  I still

11  want to kill as many of those Mormon fuckers as I can, and will

12  continue to feel that way until this Troy Rawlings, Mormon

13  liar, makes the truth public and I get peace and justice.

14      So did you also receive that email?

15  A.  I did.

16  Q.  And you have a copy of it in front of you as well?

17  A.  I do.

18  Q.  Okay.  And that's -- that one -- to whom was that addressed

19  in the subject line?

20  A.  Federal Judge Bruce S. Jenkins.

21  Q.  And was Judge Jenkins one of the listed recipients of that

22  email?

23  A.  I don't know.  I could look through the people it's

24  addressed to if I could find it.

25  Q.  Well, that's okay.  I'll withdraw that question,

1    Mr. Furner.

2        But the first line essentially states:  You're a dirty

3    mother fucker, Judge Bruce Jenkins, and you've kept your

4    promise to me in my sentencing years ago.

5        And so I guess my question really was, the email seems to

6    be directed at Judge Jenkins; is that fair?

7    A.  Yes.

8    Q.  All right.  Now, I'm going to discuss with you something

9    that has not been admitted into evidence yet, Mr. Furner, which

10   is what's been marked for identification purposes as Exhibit 8.

11   Now, Exhibit 8 is an email, just for your purposes, Mr. Furner,

12   that appears to be dated August 29th, 2016.

13       Do you have a copy of that email in front of you?

14   A.  I do.

15   Q.  Okay.  And just to make sure we're on the same page here,

16   it's an email that basically starts out and says:  James, just

17   so you'll know I'm not bullshitting you, you can see by the

18   X-ray above and the message from the University of Arizona

19   hospital below for the MRI, I'm very sick; it's

20   life-threatening.  And you Mormon mother fuckers won't quit.

21   You make sure Jenkins knows about this and soon.  Plus, if I

22   can get Cheryl to call you, you tell her the truth.  Signed,

23   Rick.

24       Is that the email that you have in front of you?

25   A.  It is, yes.

1    Q.  All right.  And based upon -- and did you receive that

2    email on or about August 29th of this year?

3    A.  Yes, I did.

4    Q.  Now, Mr. Beals, were you the only recipient of this email?

5    A.  I'm Mr. Furner but, yes, I believe I was the only

6    recipient.

7    Q.  I'm sorry I misstated.

8        So, Mr. Furner, you're the only recipient of the email; is

9    that correct?

10   A.  I believe so.  I appear to be the only two accounts on

11   here.  One is the old government email address and one is the

12   personal one, yes.

13   Q.  Okay.  And so this email again was sent just a couple of

14   days after the August 26th email that we just discussed, which

15   is Exhibit 3; is that right?

16   A.  Correct.

17   Q.  All right.  Now, going back to the fact that you appear to

18   be the only recipient of this email, did you find that unusual,

19   Mr. Furner?

20   A.  Yes.  It's the only email I recall that he sent that was

21   directed only to me.

22   Q.  So out of all of the other emails, and I know you probably

23   don't recall at this moment every single email that's come to

24   you given that there were so many, but your testimony

25   essentially is the best that you can recollect, this is the

 1    only one where he's corresponded with you only by email?

 2    A.  Yes, yes, that is correct.

 3    Q.  Do you know -- when there's a reference to Cheryl in the

 4    email, do you know who that is?

 5    A.  He has represented to me, and I seem to recall from his

 6    file, that Cheryl is his ex-wife.

 7    Q.  Okay.  And then the other thing I wanted to just point out,

 8    he signed this email "Rick", is that right, not "Richard

 9    Beals"?

10    A.  That is correct.

11    Q.  All right.

12            MR. LIZANO:  And the government moves Exhibit 8 into

13    evidence.

14            THE COURT:  Any objection?

15            MR. LABER:  No, Your Honor.

16            THE COURT:  Okay.  Exhibit 8 will be admitted.

17    BY MR. LIZANO:

18    Q.  Now, Mr. Furner, after you received this email from

19    Mr. Beals, did you have the occasion to have a -- speak with

20    Mr. Beals by phone about it?

21    A.  I did.

22    Q.  And can you explain to the court basically the content of

23    that communication that you had with Mr. Beals?

24    A.  Oh, I recall he was explaining to me the serious nature of

25    his diagnosis and the need for surgery, which was scheduled, I

DIRECT/CROSS-EXAMINATION - JAMES FURNER

think, within a week or two from the time we were talking.  He

expressed concern over his well-being after that was done, if

he made it through it all, as I recall.

So we talked about that and I also tried to explain to

Mr. Beals that I had retired, that likely our correspondence

would -- would terminate at some point in the near future, and

I expressed my concern for his well-being and truly felt bad

for how tormented he appeared to be for having gone through

this years-long ordeal.

Q.  Okay.  All right.

MR. LIZANO:  I have no further questions.

THE COURT:  Okay.  Thank you.

Mr. Laber?

MR. LABER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LABER:

Q.  Good afternoon, Mr. Furner.  This is Ed Laber.  We spoke

last week if you recall.

A.  We did.  Hi, Mr. Laber.

Q.  When Judge Jenkins asked you to get involved in this, and

I'm trying to remember our conversation from my notes, but it

sounded to me like he basically didn't want to hear from

Mr. Beals anymore and wanted you to kind of run interference.

Is that kind of a fair statement?

A.  I think it is, yes.  And I think part of that was borne out

1   of his inability to do anything further on the case because of

2   the time that had elapsed.

3   Q.  Right.  And I think when we spoke, you said in some way,

4   you know, you tried, maybe successfully, maybe not, just to

5   lend Mr. Beals a sympathetic ear, that is, you know, so he had

6   somebody to talk to about his problem; is that a fair

7   statement?

8   A.  That is correct.  I believe from what Mr. Beals represented

9   that I was probably the only person in government, at least the

10  federal government, who would accept a phone call or

11  correspondence and actually talk to him.

12  Q.  A lot of these emails, at least I haven't seen a lot of

13  them but I've seen a few of them, they have a rather long list

14  of recipients.  You were like one of a number of distributees;

15  is that right?

16  A.  That is correct, probably in the dozens, several dozens.

17  Q.  On those emails, I mean, when he was told to stop writing

18  -- well, let me back up.

19      Was he originally sending letters originally to Judge

20  Jenkins directly?

21  A.  Are you talking about emails?

22  Q.  Yeah, or, well, communication with him in any way, you

23  know, but directly or tried to communicate with him directly?

24  A.  Mr. Laber, I'm not sure if Mr. Beals ever sent physical

25  letters to the judge or if he attempted to.  My understanding

1  was that he was sending frequent emails to the judge and I

2  believe that the judge has all his emails intercepted by a

3  secretary.  And so that's probably -- information was probably

4  being filtered from her to the judge about receiving so many

5  emails.

6  Q.  All right.  So -- but after, to your knowledge anyway,

7  after Mr. Beals was told to deal with you or to write you, did

8  he stop writing to the judge, emails or calls or whatever?

9  A.  I don't believe so, no.

10  Q.  He continued writing letters?

11  A.  Yes.

12  Q.  Okay.  Do you know when he stopped or if he stopped?

13  A.  I don't -- I don't know that he ever did.  I would have to

14  look at the last email that we talked about as one of the

15  exhibits dated August 26th, 2016, to see if Judge Jenkins or

16  anybody from his chambers is on that email list.

17  Q.  Okay.  Last week after we spoke, I sent you a copy of the

18  indictment, which you probably also saw from the assistant US

19  attorney on the case, right?

20  A.  Yes.

21  Q.  So, you know, the email that was referenced, I think it was

22  -- I know you don't -- maybe you have it in front of you, but

23  it was Exhibit 1.  This is the email dated July -- July 25th of

24  2014, to Troy Rawlings.

25  A.  Yes, I have that in front of me.  I have that in front of

1  me.

2  Q.  And so if you look on the indictment, there's just that one

3  or two sentences that, you know, he threatens and uses vulgar

4  language, right?

5  A.  I don't have the indictment in front of me but I seem to

6  recall that from a quick perusal of the indictment, yes.

7  Q.  Well, the indictment says:  On or about July 25th, 2014,

8  knowingly, willfully, so on and so forth, an email

9  communication to TR and the communication contained threats to

10 injure NC.  Specifically, I'm going to kill NC someday unless I

11 see some justice.

12 A.  Right.

13 Q.  So that one sentence, but the actual email goes on for a

14 couple of pages, doesn't it?

15 A.  One page is by recipients and a full page of text and then

16 there are one, two, three, four, five, six attachments to that.

17 Q.  Okay.  You've mentioned that you've gotten over 400 emails

18 over the years?

19 A.  Yes.

20 Q.  And did he usually stay on script about his case and

21 wanting to be exonerated and feeling that he was wrongfully

22 convicted?  I mean, did they all kind of stay on the same

23 theme?

24 A.  Yes.

25 Q.  When I look at this July 25th, 2014, email, although he

1    says something about -- he uses the word I'm going to kill

2    somebody, were his other emails, for lack of a better term,

3    generally obnoxious and vulgar?

4    A.  Generally, yes.  They expressed frustration about specific

5    individuals who he believed contributed to a broad conspiracy

6    to have him wrongfully convicted.

7    Q.  Would it be a fair statement, and certainly from your

8    training as a probation officer, that he is just fixated on

9    this and this is how he vents his frustration?

10   A.  Yes.

11   Q.  To your knowledge after having corresponded with him, do

12   you know if he has gone to Utah to confront anybody personally?

13   A.  No, I don't know that he has actually come to Utah.  He

14   talked about it a few times and made some general statements of

15   what he'd like to do to people, but he qualified that by

16   saying:  But I know if I do that, I will get in trouble, and so

17   I'm not going to.

18   Q.  Would it be a fair characterization that a lot of what he

19   said, however obnoxious it was, was hyperbolic complaining?

20   A.  Most of it, as I recall, was a recitation of the conspiracy

21   against him and, in the process of communicating that, it was,

22   yes, being boisterous and agitated and frustrated.

23       Does that answer your question, Mr. Laber?

24   Q.  Yes, yes.  And when you originally -- when Judge Jenkins

25   asked you to get involved in this, this is from my notes and

1   our conversation and correct me if I'm wrong, he said:  Look, I

2   want you to deal with this guy.  Just make sure he's not going

3   to come here and do something.

4       And that was -- that was really Judge Jenkins just -- just

5   get this guy to stop bothering me and you deal with him?

6   A.  I got the impression that he was trying to redirect

7   Mr. Beals' focus from the judge to me as the sounding board

8   instead of the judge or the judge's staff.

9   Q.  All right.  Now, reference has been made to the email of

10  September where he -- let me see here, September 8th, that was

11  what's been referenced as Exhibit 8, where he writes:  James,

12  just so you know, you can see the X-ray above.

13  A.  Mr. Laber, if I can stop you.  That email I have that gives

14  that language is dated August 29th, 2016.

15  Q.  Oh, okay.  I'm looking -- there's a different thread.  I'm

16  looking at the top.

17  A.  Okay.

18  Q.  So when did you retire?

19  A.  August 31st of 2016.

20  Q.  And so you put in a little extra work after you retired to

21  talk to him?

22  A.  Sure, you bet.

23  Q.  In this email, he writes:  James, just so you know I'm not

24  bullshitting you, you can see by the X-ray above and the

25  message from the University of Arizona hospital below for the

CROSS-EXAMINATION - JAMES FURNER

```
 1   MRI, $8,300, I'm very sick; it's life-threatening.  And you
 2   Mormon MF'ers won't quit.  You make sure Jenkins knows about
 3   this and soon.  Plus, if I can get Cheryl to call you, you tell
 4   her the truth.
 5        So you have that in front of you, right?
 6   A.  I do.
 7   Q.  And so he sent you a copy of his MRI with somebody's
 8   head -- he's got a tumor in his head, right?
 9   A.  I'm not certain if it's an MRI or an X-ray or what, but it
10   appears to be skeletal structure of somebody.
11   Q.  In your long, long history of communicating with Mr. Beals,
12   I read it a certain way and I'm sure the government reads it a
13   different way, but you tell me what your impression is after I
14   tell you what my impression is is that he thinks he's dying and
15   he wants resolution, that is, he wants to be exonerated before
16   -- before he dies.
17        Did you read it that way?
18   A.  You could interpret his email of August 29th that way, yes.
19   Q.  Okay.  Was there anything -- other than those emails where
20   he says I'm going to do this and I'm going to do that, during
21   the period of time, certainly in the last -- maybe not from the
22   very beginning but certainly the last three, two or three
23   years, in talking to him, did you ever get the impression that
24   he was going to physically act out and go to Utah and hurt
25   someone?
```

1  A.  In a couple, maybe three or four of his emails, aside from

2  those that are exhibits, I sent the emails to Meg Smith of the

3  United States Marshals Service in Salt Lake City, Utah, and I

4  made some notes on there to have her take a closer look at this

5  email.  Rick appears to be more agitated.  Do you get the

6  impression he's going to act out on it, or something like that.

7  So there were a few -- a few other emails of those 450-plus

8  emails that were concerning.

9      But in those additional cases when I would send those

10  correspondence to Meg Smith, she would respond back and say:

11  No, I don't think he's going act out based on this email.  So

12  the marshals service didn't pursue anything further by sending

13  someone to visit Mr. Beals or, as far as I knew, investigate

14  any further.

15  Q.  Okay.  And, again, after having talked to him as much as

16  you did, you know, even though he used the word I'm going to

17  kill somebody or I'm going to shoot somebody, did you -- this

18  is just your own personal opinion, did you interpret that,

19  again, as just amplified frustration or would you have read

20  that, yes, literally he's going come up and shoot all the

21  Mormons up in Utah?

22  A.  Likely somewhat amplified, but given Mr. Beals' level of

23  frustration, agitation, anger, he was -- he was always on the

24  edge but I never -- he was on the edge and so that's why I

25  continued to monitor him to make sure that he didn't make a

 1   statement:  That's it.  I've not gotten anywhere.  That's the

 2   last straw.  I'm coming after people.

 3   Q.  Okay.  Now, you were never his -- officially his

 4   supervising probation officer?

 5   A.  That is correct.  I believe he was off supervision by the

 6   time I began employment with the probation office.

 7   Q.  When you got involved with him, did you lay down some

 8   ground rules for him as far as who he was to communicate with,

 9   that he was to write to you and, you know, to deal with you?

10   Did you lay down some ground rules with him?

11   A.  If there were any, it was only that Judge Jenkins asked me

12   to correspond with him, and from that point on, as far as I

13   know, he did.

14   Q.  And it begs the question of, when you told him, "Look, you

15   need to call me," did he?  Other than writing -- copying his

16   friends or whoever else he thought was interested in his case,

17   he was compliant with that, that is, I'm not saying he

18   shouldn't have been writing those letters but he was compliant

19   with writing to you?

20   A.  It wasn't a directive to him, it wasn't a ground rule, and

21   he did not exclusively correspond with me.  He had other

22   correspondence with attorneys he was trying to retain to take

23   on this case.  And so those were independent emails and I was

24   cc'd on those, I believe, along with most of the other people

25   when he was trying to retain counsel.  So there was no ground

1  rule that I'm the person you communicate with.  I was more

2  added to the list of people and, for lack of a better term, a

3  representative of the judge as a sounding board.

4  Q.  Okay.  And as I'm looking at my notes when we spoke, part

5  of his frustration is that he couldn't get a judge or any of

6  his staff to talk to him.

7  A.  Correct.

8  Q.  That's why he -- you had mentioned that you thought he had

9  some mental health issues.  I'm not asking you to give a

10  medical opinion, but do you think that he could benefit from

11  some psychological counseling?

12  A.  I do.  Someone who is that tormented by their past and with

13  no corresponding reduction in frustration over the years could

14  definitely benefit from some intervention, absolutely.

15  Q.  Was it your impression that he doesn't recognize that he

16  needs some help?

17  A.  Yes.

18  Q.  He's mentioned to me and in some of the emails that I'm

19  aware of, he keeps bringing up an issue about money, that they

20  owe him money.  Do you know anything about that?

21  A.  Oh, that's -- there were several currents that run through.

22  One has to do with being a whistleblower and money that they

23  owe him for that, I think.  There may be calculations in his

24  mind from money he had to pay associated with the case.  I'm

25  sorry.  I don't -- I don't recall all the details.  It kind of

1    interwoved through a lot of his communications that the

2    government owed him lots of money, I think in the millions of

3    dollars.

4    Q.  All right.

5              MR. LABER:  Those are all the questions I have, Your

6    Honor.

7              THE COURT:  Okay.  Thank you.

8        Mr. Lizano, 'cause I'm older than you and going to forget

9    my questions, can I ask my questions and then let you do it?

10             MR. LIZANO:  Sure, Your Honor, of course.

11             THE COURT:  Okay.

12       Sir, this is the judge.  I have a couple of questions.

13   Have you ever met Mr. Beals in person?

14             THE WITNESS:  I have not.

15             THE COURT:  Okay.  And let me ask you, how did you get

16   stuck with this job?  Is it just 'cause the judge asked you or

17   do you have some kind of psychological or counseling

18   background?

19             THE WITNESS:  It's only because the judge asked me to

20   get involved.

21             THE COURT:  Okay.  You'd described a couple of

22   situations where Mr. Beals was on edge or on the ledge or --

23   did you have to talk him off the ledge or calm him down or were

24   you able to do that?

25             THE WITNESS:  There were a few times when I tried to

```
1    get Mr. Beals to understand the concept of the best revenge is

2    to live life well and to not let this bother him anymore and

3    just go on and be productive and enjoy his life.  He has what

4    appear to be several interests outside of this case.  He has,

5    it appears to be, a talent for running business.  I know he

6    likes to travel to Europe.  And has some -- two teenage girls

7    he's trying to financially support, I believe it's in

8    Argentina.  He reported that their mother killed themselves.

9        So I tried to get him to reduce his agitation, and that was

10   in several conversations probably around 2012 or 2013.  And

11   when I realized those efforts just added to his aggravation, I

12   stopped and -- stopped offering possible solutions, which also

13   included talking to somebody, a counselor, about it and then

14   just listened to him and communicated with him.

15           THE COURT:  And do you remember the time frame you

16   referred certain emails to the US Marshals Service?

17           THE WITNESS:  Your Honor, my recollection is that all

18   of the correspondence I received from him were forwarded to Meg

19   Smith of the marshals service simply as a security review to

20   see if they picked up on something I didn't or that I missed.

21           THE COURT:  Are you saying all 450 you got or just the

22   ones that raised concerns that you forwarded?

23           THE WITNESS:  I think all 450-plus.

24           THE COURT:  Okay.  So you referred basically every

25   email you ever got from Mr. Beals to the marshals and, as far
```

```
 1    as you're aware, they never took -- other than these charges,

 2    the marshals or other law enforcement agencies did not take any

 3    action or deem them as a serious threat?

 4           THE WITNESS:  I seem to recall maybe on one occasion

 5    when Meg Smith may have said something about possibly sending

 6    marshals in Arizona to visit him and to ask him to back off on

 7    the emails.  Whether that actually occurred or not, I don't

 8    know, Your Honor.

 9           THE COURT:  Okay.  Now, before you got involved in

10    dealing with Mr. Beals, do you know if the emails that were

11    being sent to Judge Jenkins were similar to the ones we've seen

12    and heard about today?  Were they angry and threatening emails

13    to the judge or -- I guess let me just stop it there.

14        Do you know the nature of the emails?  Were they the same

15    as the ones here?

16           THE WITNESS:  I don't, Your Honor, I would only be

17    guessing.

18           THE COURT:  And you had said, I think in response to

19    Mr. Laber's question, you kind of -- Judge Jenkins kind of

20    asked you to do this, run interference.  Did you get any sense

21    that Judge Jenkins was scared or concerned or was it more of he

22    just didn't have time for this and he needed you to kind of

23    deal with it as a court employee?

24           THE WITNESS:  Your Honor, I think it was a combination

25    of both, probably more of an annoyance if we were to weigh one
```

1    a little bit heavier.

2         THE COURT:  Do you recall getting any emails or having

3    any conversations with Mr. Beals where he wasn't angry or

4    threatening, they were more cordial?  Or maybe that just wasn't

5    the purpose you were serving.

6         THE WITNESS:  I reviewed all of them in the detail

7    that I had time for.  I think the purpose for Mr. Beals' emails

8    was to convey the wrongs perpetrated against him in his mind,

9    and they always had that element to them.

10        THE COURT:  How many --

11        THE WITNESS:  I don't recall ever receiving -- maybe

12   -- maybe he did a couple where he talked about these girls he

13   was trying to financially support and trying to get a structure

14   set up for them so that they could live a half decent life in

15   Argentina.  There may have been one about some travels to

16   Europe.  But those would have been very, very few and far

17   between.

18        THE COURT:  And how many phone calls do you think you

19   had with Mr. Beals during the time you have been communicating

20   with him?

21        THE WITNESS:  Has to be close to, if not in excess of,

22   100 phone calls.

23        THE COURT:  And generally speaking, would you call him

24   or would he call you or was it pretty equal?

25        THE WITNESS:  No.  He would call me and the only time

1    I would call him is in response to a message he left to call

2    him.

3              THE COURT:  Okay.

4              THE WITNESS:  I may have called him once because I

5    hadn't heard from him in a number of months and that may have

6    been about the time that the government email account stopped

7    receiving his emails.

8              THE COURT:  Okay.  Mr. Beals ever threaten you in any

9    of your conversations via email or phone?

10             THE WITNESS:  No.  He assumed I was part of the

11   corrupt judicial system and the corrupt religious entity that

12   he refers to and he would express frustration as though I were

13   one of the people he was angry toward but he never threatened

14   me.  He never said:  I'm going to do this to you.

15             THE COURT:  And Mr. Laber touched upon this to some

16   extent but how -- can you explain how did you go about this

17   transition to reaching out to Mr. Beals to tell him that you

18   would be the person for him to talk to as opposed to Judge

19   Jenkins?

20             THE WITNESS:  I think it was more assumed from

21   Mr. Beals and it became a receptive ear to his -- to what he

22   wanted to say.  The judge asked me to look at his file and to

23   send him a letter stating that I was looking at the file.  And

24   I didn't know why the judge wanted me to keep it intentionally

25   vague, I didn't even know what I was reviewing it for but he

said:  Tell Mr. Beals you're reviewing it.

And that's how Mr. Beals began communicating with me.  He wanted to know why I was reviewing it and what part I was going to play in having his conviction overturned, and then he wanted to bring me up to speed, Mr. Beals wanted me to come up to speed on his wrongful conviction and how it needed to be resolved, and since I was a listening ear and he knew that I talked to Judge Jenkins with some frequency, that he could communicate to Judge Jenkins through me.

And so it didn't take a lot for him to decide this is a person who will listen and, from that point on, he just communicated with me 'cause I think I would listen.

THE COURT:  I guess to follow up on that, did you ever make it clear to Mr. Beals that really the purpose you were serving had nothing to do with any issues he had with his prior conviction, it was simply to hear him out and I guess be the intermediary with Judge Jenkins?

THE WITNESS:  To a degree, Your Honor.  I told Mr. Beals that I had absolutely no influence on any proceeding that had taken place before and there was nothing I could do to help facilitate what he was asking to take place.  So I told him in my review, the appeal process, the period for the appeal was long since gone, and I was simply listening to Mr. Beals and periodically communicating with the judge to let him know that Mr. Beals is doing well or that he's -- and I think I told

1    Mr. Beals, too, if you're threatening the judge, then I'm going

2    to tell the judge that, and that would have been early on.

3             THE COURT:  And I think you said the only ground rules

4    you had with Mr. Beals was he was not to email Judge Jenkins,

5    he could include other people in your emails, but I also think

6    you said he did also email Judge Jenkins after you told him

7    that.  Is that what you testified to?

8             THE WITNESS:  Boy, this is going back so many years,

9    Judge.

10            THE COURT:  Well, you know what --

11            THE WITNESS:  I think I -- go ahead.

12            THE COURT:  Oh, no, I guess what I was getting at is

13   that we have this one email dated August 26 of 2016 that Judge

14   Jenkins is included on as a recipient and I'm just wondering if

15   you have any sense of what -- if whether Mr. Beals was

16   regularly communicating with Judge Jenkins or what triggered

17   this email where his hostility seemed to turn directly at Judge

18   Jenkins.

19            THE WITNESS:  Your Honor, they periodically through

20   the years focused on Judge Jenkins.  That was a reoccurring

21   subject line, if not content, to Mr. Beals' email about how

22   frustrated he was with Judge Jenkins, how the jury was fixed,

23   how Judge Jenkins told him:  You're going to hate me by the

24   time this is all over.  And then how Judge Jenkins was part of

25   a conspiracy against Mr. Beals.  So it's been a current through

REDIRECT EXAMINATION - JAMES FURNER

1    the years.

2           THE COURT:  Okay.  Thank you.  That's all I have.

3        Mr. Lizano?

4           MR. LIZANO:  Thanks, Judge.

5                    REDIRECT EXAMINATION

6    BY MR. LIZANO:

7    Q.  Just a few more kind of clarifying questions.

8        So, when you were being examined by Mr. Laber a moment ago,

9    you mentioned a certain kind of, I guess, class of emails where

10   Mr. Beals would say something along the lines about wanting to

11   go to Utah and perhaps commit harm but -- and then he would add

12   a qualifier and essentially say he knows he can't do that.

13       Is that a fair summary of what you testified to?

14   A.  It is, yes.  He would do that both in email and over the

15   phone.

16   Q.  Right.  And how many -- how many times did that occur, if

17   you had to put a number on it, where there was an actual

18   expression of a desire to go to Utah and commit some harm?

19   A.  Just to Utah, probably a dozen times.  To other people in

20   general, probably two dozen times.

21   Q.  And, you know, obviously before your testimony today, you'd

22   spoken with Mr. Laber and you looked at some of these emails in

23   closer detail.  You know, when you reviewed Exhibits 1 and 2,

24   which is one of the emails which is the, "I'm going to kill

25   Neil Crist someday" and then the other one about "shooting the

REDIRECT EXAMINATION - JAMES FURNER

1    Mormon MF'ers", when those were specifically brought to your

2    attention, did you view those as qualitatively different in

3    nature than kind of the noise of the other type of emails and

4    statements he'd been making in the past once you had a chance

5    to focus on it?

6    A.  Yes.  I was surprised.  That was a definite departure from

7    his typical emails.  And I think they escaped my attention and

8    my scrutiny because of the other -- well, first of all, because

9    of the volume of emails from Mr. Beals and them tending to be

10   of a repetitive nature, and that, coupled with my other duties,

11   I had limited time to really scrutinize all the language in the

12   emails and so, yeah, that was a surprise when they were brought

13   to my attention and I specifically reviewed those comments.

14   Q.  Okay.  And you also previously testified about how you

15   would essentially, if I'm understanding it right, refer pretty

16   much all the emails that you received from Mr. Beals to Meg

17   Smith, I think you said her name was, at the US Marshals.  I

18   can't remember if I got the name right.

19   A.  Yes, yes, you did get it correct.

20   Q.  Okay.  So you would do that, but I think I also heard you

21   testify that there were at least a handful of emails where you

22   put some additional commentary along with that when you did

23   forward them to Ms. Smith at the US Marshals; is that right?

24   A.  That is correct.

25   Q.  And is it fair to say that those, at least, were some

1  emails where something about it caught your attention, you

2  know, to warrant you expressing your concerns in writing to

3  Ms. Smith; is that fair?

4  A.  Yeah, that's fair.

5  Q.  Okay.  And -- but to your knowledge, the US Marshals

6  Service didn't -- didn't do anything to follow up on any of the

7  emails that you forwarded; is that right?

8  A.  That's my understanding, yes.

9  Q.  Right.  But you don't know -- I mean, they wouldn't

10 necessarily have told you if they had forwarded them to the FBI

11 or done other things with them, would they?

12 A.  That's a very -- that's a very good point, yes.

13 Q.  Okay.  I'm just reviewing my notes to see if I have any

14 other questions.

15     Do you know -- actually, just one final question.  So

16 obviously you're part of the courthouse community or you were

17 before you retired, the courthouse community in Salt Lake; is

18 that right?

19 A.  Yes.

20 Q.  And do you know, then -- you've testified that Judge

21 Jenkins kind of viewed this as, you know, a concern, scared,

22 but if you had to weigh it, I think you said that maybe you'd

23 put it on -- a little bit on the side of the annoyance, but

24 there definitely was a concern about Mr. Beals and security; is

25 that fair to say?

REDIRECT EXAMINATION - JAMES FURNER                    35

A.  Yes.

Q.  And, you know, being part of this courthouse community in

Salt Lake, I mean, do you know if other people in the

courthouse were aware of Mr. Beals and what their feelings were

about him in terms of whether or not they viewed him as a

concern or a threat?

            MR. LABER:  Object to foundation, Your Honor.

            MR. LIZANO:  Well, I'm asking if he knows.  And, you

know, if he doesn't know, that's fine.  But also the rules of

evidence don't apply in one of these hearings so I'd like to

hear what he has to say.

            THE COURT:  Mr. Laber?

            MR. LABER:  I know the rules of evidence don't apply

but when you get into the speculative nature of generally what

other people might have thought, I think it even goes beyond

the bounds of what would be something that should at least be

reasonably reliable on which the court is going to make a

decision so I'm going to object.

            THE COURT:  I'll overrule it as to form.  One of the

things I was interested in was whether the marshals service or

court security had an alert or look-out for Mr. Beals within

the courthouse.  So maybe a question along kind of that line in

terms of rather than what people feared or thought.

            MR. LIZANO:  Okay.  Well, I'll just re-ask that same

question, Judge.

REDIRECT EXAMINATION - JAMES FURNER

```
 1              THE COURT:  Sure.
 2              MR. LIZANO:  Do you want to ask it?
 3              THE COURT:  No.  You ask it better than I do.
 4  BY MR. LIZANO:
 5  Q.  Okay.  So, Mr. Furner, essentially, you know, being part of
 6  the courthouse community there, are you aware of the US
 7  Marshals Service putting any type of, I don't know the best
 8  word for it, a lookout or just, you know, be cautious if this
 9  person arrives at the courthouse doors, tell somebody?
10  A.  If that occurred, it was only on one occasion.  And I know
11  -- Meg Smith and I talked about that possibility but I don't
12  know if it was ever carried out.
13  Q.  Okay.  And what were the circumstances that gave rise to
14  that one occasion as best you can remember?
15              MR. LABER:  I'd still object -- excuse me.  I would
16  object to foundation as to time, place, this kind of thing
17  because, you know, the recency of this matters.
18              THE COURT:  Okay.  Well, you can lay some foundation
19  -- I guess why don't you just lay a little foundation as to the
20  time frame and then you can get into the circumstances.
21              MR. LIZANO:  Okay.
22  BY MR. LIZANO:
23  Q.  Yes, and if you could, so you'd mentioned just now one
24  instance in which there was a discussion that you had with
25  Ms. Smith about potentially alerting other members of the
```

1    courthouse; is that right?

2    A.  Yes.

3    Q.  Okay.  When did that occur?

4    A.  That would have been early, early on in my correspondence

5    with Mr. Beals, and that probably would have been around 2010,

6    maybe 2009.

7    Q.  Okay.  And --

8    A.  And nothing since that I'm aware of.

9    Q.  Okay.  And what were the circumstances that gave rise to

10   that in 2009, 2010?

11   A.  It seems like one of his emails may have suggested he

12   wanted to come to Utah and so I talked to Meg about it and she

13   said:  Well, we can put out a bulletin so that the CSOs know

14   that if he comes to the building, they know he's here, they can

15   be looking for him.  But whether that was carried out or not, I

16   do not know.

17   Q.  Was it your idea or her idea to do the bulletin?

18   A.  Probably hers.

19   Q.  Okay.  But it sounds like, and you correct me if I'm wrong,

20   that the impetus for this was your -- you were concerned enough

21   that you -- did you ask about that type of possibility, to

22   alert others?

23   A.  No, it would only have been sharing a concern with Meg

24   about the content of one of the emails.  And so it was

25   discussed as an option.  Whether it was carried out or not, I

 1   don't know.

 2   Q.  Okay.  But generally speaking, it's the result of some

 3   concern that he might actually go to the courthouse?

 4   A.  Sure, yes.

 5   Q.  Okay.

 6           MR. LIZANO:  I don't think I have anything else, Your

 7   Honor.

 8           THE COURT:  Okay.  All right.  Luckily retired

 9   probation officer Furner, thank you very much.

10           THE WITNESS:  You're welcome.

11           THE COURT:  I'm sorry that you made yourself available

12   last week and we didn't get to you.  But thanks so much for

13   being available and you enjoy your retirement.

14           THE WITNESS:  Thank you, Your Honor.

15      Can I -- can I express to Mr. Beals my regards and best

16   wishes for him?  This has got to be difficult for him and I

17   just send him my regards.

18           THE COURT:  Okay.  I think he heard that.  So

19   appreciate it.

20           THE WITNESS:  All right.

21           THE COURT:  Thank you.

22           THE WITNESS:  You're welcome.

23      (The telephone call with Mr. Furner was disconnected.)

24           THE COURT:  We hang up?

25           CLERK:  Yes.

```
 1              THE COURT:  Okay.  Mr. Lizano, do you have any other
 2     witnesses?
 3              MR. LIZANO:  I have no other witnesses, Your Honor.
 4     There's a matter I guess we're going to address at sidebar.
 5     Before we get there, I wanted to just discuss the remaining
 6     exhibits that we're proffering and then we'll deal with the
 7     other issue if that's okay.
 8              THE COURT:  Sure.
 9              MR. LIZANO:  So the government also moves into
10     evidence Exhibits 5, 6, and 7.  I think the easiest would be to
11     start with 6 and 7 first.  These are forensic evaluations that
12     occurred I guess in connection with Mr. Beals' two prior court
13     cases in 1990 and 1995, and I don't believe Mr. Laber has any
14     objection to the admission of those.
15              MR. LABER:  I had an objection to Exhibit 5.
16              THE COURT:  Okay.
17              MR. LIZANO:  Right, but not 6 and 7.
18              MR. LABER:  6 and 7, no.
19              MR. LIZANO:  Okay.  So we'll move those in evidence,
20     Your Honor.
21              THE COURT:  Okay.  6 and 7 will be admitted without
22     objection.  And then 5 is the detention hearing issue?
23              MR. LIZANO:  Yes, Your Honor.  And so the government's
24     moving that into evidence as well.  I guess, and I don't want
25     to put words in Mr. Laber's mouth, I'm sure he will articulate
```

```
 1    his objection, but my understanding is he objects based upon

 2    the fact that that's a very old document.  But, nonetheless,

 3    the government's position is that this is a -- this is a

 4    document -- these are findings that were made by a magistrate

 5    judge and part of the public, you know, court record, and that,

 6    you know, during these hearings, again, the rules of evidence

 7    don't apply and we feel that the court is, you know, more than

 8    capable of, you know, assessing the weight to give to these

 9    findings so many years after the fact.

10        But we do think it is pertinent information that the court

11    should be aware of in assessing Mr. Beals' situation.  And

12    also, I believe Mr. Brown, my cocounsel, had represented to

13    Mr. Laber that we're not intending to make the argument that,

14    oh, well, because a magistrate judge, you know, a decade ago,

15    you know, decided to hold him that, therefore, automatically

16    that you must do the same thing.  We only want to produce it

17    for the factual findings that were made in connection with that

18    prior case.

19             THE COURT:  Okay.  Thank you.

20        Mr. Laber?  And just to let you know, Mr. Laber, I would

21    consider it.  I mean, granted this is what, 20 years ago, close

22    to 20 -- well, no, what, yeah, over 20 years ago, I guess.  I

23    would take that for what it's worth.  But I'm happy to hear

24    from you on anything other than the --

25             MR. LABER:  Well, even though the rules of evidence
```

don't apply, you know, we don't get to come in here and say

whatever we want or say, oh, you know, I heard that somebody

else said something and that becomes proffer.

    Here is a different situation where we have a judge who's

made an opinion 20 years ago, and on circumstances that relate

to the case.  It's basically saying he should be detained now

'cause he was detained 20 years ago.  And this is just, you

know, classic bad act evidence and it becomes worse because

it's signed by a judge.  And it just seems to me that the

prejudicial effect of that is -- far outweighs the fairness of

allowing it in.

            THE COURT:  Okay.

            MR. LIZANO:  May I respond, Your Honor, just very

briefly?

            THE COURT:  Sure.

            MR. LIZANO:  Well, the only thing I'd point out is,

you know, I mean, again, these were factual findings that were

made by a judge presumably after an evidentiary hearing.  So to

the extent there were concerns about the reliability of those

findings, I think that concern would be misplaced.  I mean,

these are findings of fact and an official court document

signed by a judge.  I think the reliability of those findings

are -- can speak for themselves.

            THE COURT:  Okay.  Thank you.  Well, it is old but

it's still part of the defendant's history and characteristics.

1    I'm going to admit it.  Frankly, I think it cuts both ways.  I

2    mean, obviously there are references to numerous threats he's

3    made.  But while he's talked the talk, he hasn't walked the

4    walk, including the threats made back in the '80s and '90s, and

5    there haven't been -- apparently none of those threats have

6    been followed up on.

7        So, frankly, I think it cuts both ways in terms of the

8    dangerousness analysis.  And what's going to be more relevant

9    is the most current issues that we're dealing with, the alleged

10   threats.  So -- okay.

11       And, Mr. Lizano, those exhibits, we have eight exhibits

12   that will be admitted.

13       And, Mr. Lizano, oh, did you want to address the issue at

14   sidebar?

15           MR. LIZANO:  Yes.

16       (A sidebar conference was held.)

17           MR. LABER:  So my client wants to testify.

18           THE COURT:  Okay.

19           MR. LABER:  'Nuff said.  Obviously, you know, I told

20   him, you know, look, whatever you say is going to be used

21   against you.  And he says, oh, you know, then he starts going

22   in on the old FBI file and everything else.  I can't let him

23   take the stand and I don't want to lose his confidence, and I

24   think that I'll make a statement that he wants to take the

25   stand and -- against my advice, and perhaps you could kind of

1    reinforce to him that maybe it's not such a good idea.  I'm not

2    asking you to advocate for me.  But --

3              THE COURT:  Well, I'll explain the risk of him

4    testifying and I'll explain the narrow focus of the testimony

5    regarding the detention and release issue, and --

6              MR. LABER:  I think you'll have to tell him that if he

7    wanders into anything about that, you know, his trial or

8    whatever, you're going to have to stop him.

9              THE COURT:  Yeah, okay.  Sound okay?

10             MR. LIZANO:  Yeah.

11             THE COURT:  That was the record?

12             MR. LABER:  Yeah.

13             MR. LIZANO:  Yeah.

14             MR. LABER:  For the record, I don't want him to

15   testify.

16             THE COURT:  Okay.  And then did you have other

17   witnesses, too?

18             MR. LABER:  Well, you know, actually, I do.  I have

19   two witnesses and one of them is going to be, we're going to

20   propose as a third party what do you call it, third-party

21   custodian, and so I think you should hear from them.  I mean, I

22   can proffer it, too, but I think I'd like you to hear from

23   them, won't take very long.

24             THE COURT:  You want to call them first and give him a

25   chance to think about it?

 1          MR. LABER:  Yeah, okay.

 2      (The sidebar conference was concluded.)

 3          THE COURT:  So, Mr. Laber's going to have some

 4  witnesses.

 5          MR. LABER:  So, Your Honor, the first witness I'll

 6  call is James McRee.

 7          THE COURT:  Okay.  McRee, is that the last name?

 8          MR. LABER:  McRee, yes.

 9          THE COURT:  Okay.  Come on forward, sir, you can come

10  up to the witness stand and Allison will administer the oath to

11  you.

12          JAMES R. McREE, DEFENSE WITNESS, WAS SWORN.

13                    DIRECT EXAMINATION

14  BY MR. LABER:

15  Q.  Your name and your address, please?

16  A.  My name is James R. McRee.  My address is 1350 South

17  Placita Brisa Serena, Tucson, Arizona 85748.

18  Q.  Mr. McRee, how long have you lived in Tucson?

19  A.  February 14th of 1994.

20  Q.  And what do you do, sir?

21  A.  I am a branch manager for a wholesale distribution company.

22  Q.  All right.  Are you married?

23  A.  I am.

24  Q.  Children?

25  A.  Two.

1    Q.  Do you know Mr. Beals?

2    A.  Yes.

3    Q.  And how do you know Mr. Beals?

4    A.  I've known -- I know Mr. Beals in a, you know, we're

5    friends, good buddies.

6    Q.  How did you meet him?

7    A.  I met him in a restaurant in Barrio East; we frequented

8    together and just struck up conversations and --

9    Q.  How many -- well, how many years ago did you meet him?

10   A.  Probably 1995, as soon as I arrived, you know, a year or

11   two after.

12   Q.  So 20 years?

13   A.  Right, right, long time.

14   Q.  And this was -- would have been after his issues in Utah?

15   A.  Correct.

16   Q.  Did you ever hear about those?

17   A.  Yeah, but never went into detail.  I never -- yeah, never

18   in detail.

19   Q.  Okay.  There's been testimony about a lot of these emails.

20   A.  Correct.

21   Q.  Were you on the email list?

22   A.  I was.

23   Q.  Okay.  And how many emails did you get?

24   A.  Well, quite a few evidently.  You know, I never counted

25   them, you know.

1    Q.  Well, after you got the emails and then you saw him and you

2    talked to him, did you ever say:  What is this?

3    A.  I said:  Knock this stuff off.  You know, he's never missed

4    a meal and he comes and goes as he pleases, he travels the

5    world.  So, you know, I told him just to knock it off.

6    Q.  Okay.  Obviously he didn't listen to you?

7    A.  Correct.

8    Q.  But, you know, we've heard all this testimony and, you

9    know, some things that are not very complimentary but tell me

10   about Mr. Beals in your relationship with him.

11   A.  My relationship with Mr. Beals -- with Beals, that's what

12   we call him, he's like a father figure to me.  My -- my own

13   father, you know, my parents were married over 50 years.  My

14   dad was a great role model and all that.  And they had a lot

15   of, you know, parallels as far as a fixed integrity, work

16   ethic, and things of that nature.

17       So when I moved out here, you know, I enjoyed being around

18   and bouncing business ideas off of him, whether it's investing,

19   you know, and just day-to-day management stuff, things like

20   that.

21   Q.  I think you mentioned that you and he had a business deal.

22   The two of you made some money?

23   A.  Right.  When -- and that's really where we hit it off.  He

24   had a construction project and I was in the finance industry at

25   that time and I was able to get him financing for his project.

He built townhomes and I was able to get him financing for the
construction of his first two townhomes and then it rolled from
there.  But that was our only business transaction.  As a
matter of fact, we never even closed that transaction.  So --
just so you know.

Q.  So is it a fair statement that you admire him and find him
admirable?

A.  Absolutely.  Mr. Beals -- Beals has never lied to me.  And
he is a dear friend.  He's come over to my house for my kids'
birthday parties.  I -- you know, it's -- we have a tradition
where every golf major I will come over to his house.  Friday
night we'll have dinner, we'll either go out or we'll cook at
his house.  I will spend the night there.  And then -- simply
because I don't want to drive home.  And then Sunday we'll
watch, you know, the golf majors.

Two of those majors, the Masters usually falls on Easter
Sunday so, you know, sometimes I'll, you know, miss family
functions to spend time with him.  And the other, the US Open
golf tournament falls on Father's Day.  So there is, you know,
a history there and, you know, I enjoy his company.  He -- you
know, he brings a lot to the table, if you will, you know.

Q.  When you're with him and socialize with him or -- with him,
and you've heard this testimony that he writes emails and
you've seen the emails?

A.  Right.

1    Q.  But is he generally when -- does he appear to be a kind and

2    compassionate person?

3    A.  Absolutely.  This whole thing is less than 5 percent of,

4    you know, what I know of Mr. Beals, of Beals.  I mean, it's --

5    we talk about travel, we talk about golf, we talk about family,

6    we talk about, you know, investing money, things of that

7    nature.

8    Q.  There was mention by Mr. Furner about the two girls that

9    live in Argentina.

10   A.  Uh-huh.

11   Q.  What do you know about that?

12   A.  They -- you know, Argentina is very third world country,

13   but Beals has taken it upon himself, you know, to take those

14   girls under his wing.  He's moved them out of, you know, the

15   ghetto or barrio.  He's bought them a house, he's put them in

16   better schools, and he does hold them accountable.  I know he's

17   held them accountable to learn English and, you know, he's

18   trying to, you know, make a better life for two kids that are

19   -- have touched his heart, so --

20   Q.  He doesn't have children of his own?

21   A.  No, he does not.

22   Q.  He cares about these girls?

23   A.  Absolutely.

24   Q.  Did you ever get the impression that he would do anything

25   to jeopardize his ability to help those girls?

DIRECT EXAMINATION - JAMES McREE                    49

1    A.  No.  In fact, the last two weeks, that's been his focus, is

2    to make sure that they are taken care of, yeah.

3    Q.  He's called you on the phone from the jail?

4    A.  Uh-huh, yes.

5    Q.  Is that what he talks about, the girls?

6    A.  A little bit, yeah.

7    Q.  Does he send them money, to your knowledge?

8    A.  Does he send them money?  Yes, yeah.

9    Q.  Okay.  Before we started the hearing, I explained to you

10   what a third-party custodian is?

11   A.  Correct.

12   Q.  And, you know, if you would be another set of eyes?

13   A.  Uh-huh.

14   Q.  Are you willing to act as a third-party custodian?

15   A.  Yes, I am.

16   Q.  If that required you to check on him several times a week

17   or even every day, would you be willing to do that?

18   A.  I would be able to and willing, yes.

19   Q.  And if you knew or you found out that he was doing

20   something that was violative of his conditions of release,

21   whatever it may be, despite the fact that you're his friend, as

22   his third-party custodian, would you be willing to call

23   pretrial services and say, "He's not complying"?

24   A.  Yes.

25   Q.  You wouldn't have any reservations about that?

DIRECT EXAMINATION - JAMES McREE                          50

1    A.  None at all.

2    Q.  You've been in his house?

3    A.  Uh-huh, yes.

4    Q.  Have you seen firearms in his house?

5    A.  I have not, no.

6    Q.  Does he talk about firearms?

7    A.  Never.  This -- yeah, from what I've heard these two times

8    I've been here, I'm shocked, so --

9    Q.  Okay.  And --

10   A.  As it pertains to firearms, yeah.

11   Q.  And bomb-making materials, anything you know like that?

12   A.  No, no.

13   Q.  That's not really his interest, is it?

14   A.  Not at all.

15   Q.  When you're with him, other than seeing his emails, does he

16   bring up in conversation you know, "I'd like to go out and kill

17   people.  I'm going to get on a plane and go to Utah and start

18   shooting people"?

19   A.  No, that's never brought up.  As far as, you know, his --

20   his comments or rants are more of the injustices done to him.

21   It's not about going out and harming anybody, you know.  He

22   tries to -- he tries to explain the intricacies of the case

23   and, quite honestly, I'm here to, you know, just hang out.  I

24   don't -- you know, I don't want to try and figure it out.  I'm

25   not an attorney.

UNITED STATES DISTRICT COURT

1  Q.  But that's when you saw his emails?

2  A.  Uh-huh.

3  Q.  And, of course, they weren't directed to you?

4  A.  Right.

5  Q.  But when you saw those emails, did you ever go, you know,

6  "Boy, I think I better turn these in, I think he might go do

7  something and hurt somebody"?

8  A.  No, no, it's not in his nature.  He's not a violent person

9  at all.

10  Q.  Also before the hearing we discussed -- you know that he's

11  a man of means, anyway?

12  A.  Uh-huh.

13  Q.  He has money.  But would you be willing to sign a signature

14  bond of a few thousand dollars with the understanding that if

15  he flees, you would be on the hook for, say, $5,000, if that's

16  what you signed?  Would you be willing to do that?

17  A.  Yes.  With that -- that amount I would be comfortable with,

18  yes.

19  Q.  You'd be able to pay that amount if he didn't comply?

20  A.  Yes.

21  Q.  You have that much confidence that you'd be willing to sign

22  for him?

23  A.  Yes.

24        MR. LABER:  That's all I have, Your Honor.

25        THE COURT:  Mr. Lizano?

```
1           MR. LIZANO:  Yeah.  And, Your Honor, may we go to

2    sidebar for just a moment?

3           THE COURT:  Sure.

4      (A sidebar conference was held.)

5           MR. LIZANO:  Well, as I was listening to the

6    testimony, I was thinking obviously of questions to ask and two

7    came to mind.  Number one is I was going to ask him whether or

8    not he's aware of Mr. Beals' criminal history, and I wasn't

9    going to go into excruciating detail about it but I want to try

10   to test to see how much he really knows about it.  But since it

11   has a, you know, obviously it could be a little inflammatory, I

12   just wanted to bring that up before I actually did it.

13          MR. LABER:  He knows about it now.  But I think it's a

14   fair question.

15          MR. LIZANO:  Okay.  Then the other question I was

16   going to ask also is, you know, a reason to come sidebar is I

17   was going to ask the witness whether or not he knows if he's

18   Mormon or not.  And I think normally I wouldn't bring this up,

19   you know, about religion but I think obviously Mr. Beals'

20   feelings about, you know, about other people depend a lot in

21   his own words whether or not they're Mormons and he obviously

22   has very strong feelings so --

23          MR. LABER:  If he says yes, you're sunk.

24          MR. LIZANO:  Yeah, well --

25          THE COURT:  Well, I was rather interested and I didn't
```

```
 1   know if I was going to ask it is if part of their interests are

 2   in, I guess, their joint views on the Mormon faith.  I don't

 3   think I'm going to ask that but I think it's fair game, though,

 4   given the threats, so --

 5              MR. LIZANO:  Yeah, well, I may or may not ask that

 6   question.  But I just wanted to give a heads-up that that is

 7   something I might go into before I did it.

 8              THE COURT:  I appreciate that.  I'm sure Mr. Laber

 9   does, too.  Thank you.

10        (The sidebar conference was concluded.)

11              THE COURT:  Okay.  Mr. McRee, I think you're almost

12   done.  Mr. Lizano is going to ask you a couple of questions.

13              THE WITNESS:  Okay.

14                      CROSS-EXAMINATION

15   BY MR. LIZANO:

16   Q.  So -- and thank you for making the time to come here today.

17   I appreciate that.

18   A.  My pleasure.

19   Q.  So, actually, if I could just understand a little bit more

20   about your background in terms of -- and just your job

21   responsibilities.  I mean, do you work full time?

22   A.  I do.

23   Q.  And obviously you've got -- you've got a wife and two kids

24   and I'm sure that takes up a lot of your time as well; is that

25   fair to say?
```

CROSS-EXAMINATION - JAMES McREE                                    54

1    A.  Sure.

2    Q.  Yeah?

3    A.  Yeah.

4    Q.  Okay.  And, you know, as you were testifying, the

5    impression I got was that maybe Mr. Beals has gone into some

6    detail with you about his affairs and his complaints but you

7    kind of have told him to just stop talking to you about it

8    'cause you're not really all that interested in it; is that

9    right?

10   A.  Yeah.

11   Q.  Yeah, okay.  So and I think you testified that he really

12   hasn't gone into much detail with you, you know, about his

13   issues, so to speak, with you about that, has he?

14   A.  He tries to but it's -- you know, my time when I spend with

15   Beals is limited so I prefer to spend time BS'ing about stuff

16   that we both truly want to talk about and enjoy.  So, yeah, if

17   he starts bringing up detailed stuff, I just, you know, I'll

18   listen for a few moments and agree and appease him but then

19   basically try and steer the conversation back to stuff.

20   Q.  Just more kind of small talk, lighthearted topics rather

21   than that?

22   A.  Right.

23   Q.  Okay.  And I guess you also said that you told Mr. Beals

24   after you -- 'cause you received some of these emails, right?

25   You told him to knock it off, right?

CROSS-EXAMINATION - JAMES McREE

```
 1   A.  I did on one of the responses.  Yeah, Rick's had some

 2   health concerns and, honestly, it was a gut punch when we saw

 3   the tumor in his head and stuff like that.  And I'd been

 4   telling him to go see a doctor literally for ten months.  I

 5   mean, it went on -- started almost a year ago, so -- and when

 6   we got the results, you know, and stuff like that, he's going

 7   have surgery and potentially it's noncancerous but there's

 8   still a small percent that it may be, it was a relief.  And so,

 9   yeah, you know, I guess he did send an email out after we found

10   out some good news and I said:  Knock your crap off.

11   Obviously, you're feeling well, so --

12   Q.  Right.  But how about before that?

13   A.  No.  I don't read them.  To be honest with you, when Beals

14   sends them, you know, we just delete them.  I have a wife, two

15   young daughters.  So I don't feel it's appropriate for them to,

16   you know, see the language and all that stuff.  So we just try

17   and delete them --

18   Q.  Right.  Right.

19   A.  -- as they come across.  I don't read them.

20   Q.  Yeah, I mean, being with the wife and two young daughters,

21   you also don't want Mr. Beals -- he can't stay at your house,

22   right?

23   A.  Correct.

24   Q.  Right.

25   A.  I mean, you know, worst-case scenario he could.  I do have
```

1  an available bedroom and another bathroom, you know.  It would

2  be interesting but, yeah.

3  Q.  Yeah, you don't -- I mean, you don't really want him there,

4  right, with your wife and kids?

5  A.  He behaves himself when he's around my wife and kids but,

6  you know, I mean, Utopian situation, I'm confident he could,

7  you know, stay at his own residence and --

8  Q.  So obviously, you know, coming to court and seeing these

9  emails, I guess you said that you were kind of shocked; is that

10 right?

11 A.  Well, what I was shocked or surprised about were the -- the

12 -- I'd say the emails, the gun -- he had a firearm or something

13 however many years ago.  I think -- I don't know.  The police

14 visited or something, the FBI, and I think found a firearm at

15 his house.  That was surprising to me 'cause, you know, he's

16 never talked about guns.  We've never talked about hunting or

17 anything like that.  So -- and it was a long time ago, so I was

18 just sort of --

19 Q.  Has he ever told you about the rest of his criminal record?

20 A.  I know about the DUI and, you know, that's unfortunate.

21 But, yeah, he has brought up the -- where it all started from

22 with -- I don't know how much detail I can go into but I don't

23 want to incriminate anybody but, yeah, he's gone into a little

24 bit.  I have a general knowledge or general grasp of the stuff

25 that went off in the late '80s, early '90s.

CROSS-EXAMINATION - JAMES McREE                    57

```
 1   Q.  Okay.  Are you aware that he has -- did he ever tell you
 2   about the criminal record that he has before that, at least for
 3   arrests for different types of crimes?
 4   A.  No.  I personally feel nobody brags about their criminal
 5   history.  I don't think that's something someone does.
 6   Q.  Right.  But he didn't tell any of that to you?
 7   A.  No.  I never asked so there's no reason to tell me.
 8   Q.  So, you know, you've seen these emails, these -- they're
 9   alleged to contain threats, you know, "I'm going to kill Neil
10   Crist someday.  I'm going to shoot you Mormon MF'ers."  You've
11   heard about that because you've been here for the court
12   hearings, correct?
13   A.  Right, correct.
14   Q.  That doesn't raise any question in your mind about
15   Mr. Beals and what he might be capable of?
16   A.  In my mind, there's absolutely no way Mr. Beals is capable
17   of hurting anybody.  I personally think they're just rants and
18   that's why, you know -- I'm sure you have records of my email
19   response.  I think I responded once.  I just hit reply all in
20   August and said:  Knock your crap off.  And, you know, that was
21   my only response but, no.
22       Beals -- the joke is Beals does not go south of River Road.
23   He lives at Swan and Sunrise is the major crossroads.  He does
24   not go further than River Road.
25   Q.  Why is that?
```

UNITED STATES DISTRICT COURT

1    A.  Why?  He just doesn't.  You know, he goes to Sullivan's

2    Steakhouse is probably as far south as he goes.  That's the way

3    he is.

4    Q.  Okay.

5    A.  He has a routine, so --

6    Q.  So you weren't -- I mean, you know, when these -- when

7    these messages were brought to your attention, that didn't

8    raise any concerns in your mind about, you know -- I mean, do

9    you have other friends who threaten to kill people?

10   A.  No, I don't.  No.  Probably the reason it doesn't -- it

11   didn't have an effect on me is just because I know him.  I know

12   him intimately might be the term.  Like I said, he knows -- you

13   know, he's been around my wife, he's been around my kids, I've

14   had him over for dinners and birthday parties.  You know, I

15   spend the night at his house.

16        You know, just -- so I feel I know him inside and out.  I

17   don't feel there's a Jekyll/Hyde to Beals.  You know, he's

18   going tell you what he thinks, he's not going to sugarcoat it.

19   That's probably why I like him so much because you always know

20   where you stand, you know.  And if -- if you're a friend of his

21   or he, you know, wants to hang out with you and be your friend,

22   you're -- you know, you bring something to the table.  You're a

23   straight shooter, you have integrity, you have ethics.  You

24   know, you'd probably enjoy hanging out with him.

25   Q.  I've got no comment on that.  But -- okay.  All right.

1          MR. LIZANO:  Well, I don't have any further questions.

2          THE COURT:  Mr. McRee, I've just got a couple of

3    questions.

4          THE WITNESS:  Sure.

5          THE COURT:  Based on how you've described Mr. Beals

6    and obviously the emails that you've been sent and heard about,

7    how do you reconcile the man you know with the anger, hate, and

8    threats in the emails or can you reconcile it or is it like you

9    just said, the rantings?

10          THE WITNESS:  Yeah, I think it's just ranting.  And

11   it's definitely escalated the last few years and I don't know

12   why personally.  But I don't know, I can't --

13          THE COURT:  Okay.  Okay.  That's all I have.

14       Mr. Laber, do you have anything else?

15          MR. LABER:  No.

16          THE COURT:  All right.  Mr. McRee, thank you very

17   much.  You can step down.

18          MR. LABER:  So I'll call Ms. Karol Waldron.

19          THE COURT:  Okay.  Thank you.  You can go right up

20   here, Ms. Waldron.  Keystone Cops here; we're sending you

21   everywhere.

22       KAROL R. WALDRON, DEFENSE WITNESS, WAS SWORN.

23          THE COURT:  Thank you, Ms. Waldron.  You may get some

24   water if you need.  I don't think Mr. McRee thought he was

25   going to be up there that long.

DIRECT EXAMINATION

BY MR. LABER:

Q.  So tell us your name, please.

A.  My name is Karol R. Waldron.

Q.  And you spell Karol with a K?

A.  Correct.

Q.  And where do you live?

A.  My address is 4894 East Placita Arenosa, Tucson, Arizona 85718.

Q.  And how long have you lived in Tucson?

A.  Since 1977, with the exception of college.

Q.  Okay.  And do you know Mr. Beals?

A.  Yes, I do.

Q.  What do you do for a living?

A.  I am the director of strategic channels for a company called Xmedia Solution.  We're a software company based in Montreal.

Q.  Okay.  Do you go -- you don't work in Montreal though?

A.  Oh, correct, no, I'm over-modem employed; I'm home based.

Q.  Okay.  What exactly are your duties?

A.  Pardon me?

Q.  What exactly do you do?

A.  Well, in the software universe, "channel" is referred to distribution channels.  I'm responsible for the go-to market strategies of my company with regard to through whom we sell

1    our products and how we do it.

2    Q.  Okay.  And it carries with it a lot of responsibility?

3    A.  It does.

4    Q.  Does your job require you to travel?

5    A.  Yes.

6    Q.  And how often do you travel?

7    A.  In an average month it's one to two weeks a month.  Moving

8    into the end of this year, it will be increasing for a short

9    period of time.

10   Q.  So I understand you travel to Europe and South America and

11   wherever you have to go?

12   A.  Not specifically those places but, you bet, I'll be

13   traveling internationally more between now and February of

14   2017.

15   Q.  Okay.  We had brought up the issue of you being a

16   third-party custodian.

17   A.  Right.

18   Q.  And but for the fact that you travel, you would do it?

19   A.  Oh, absolutely I would do it, in a heartbeat.

20   Q.  And if the court found that even if there was travel

21   involved and there was another third-party custodian, would you

22   still be willing to do it?

23   A.  Yes.

24   Q.  Can you tell the court what I explained to you what a

25   third-party custodian is, what your duties would be?

1    A.  Yes, absolutely.  It's my understanding that with the

2    responsibility of custodianship comes the responsibility of

3    reporting any wrongdoing on the part of Mr. Beals in the event

4    of his release.  Meaning, as a custodian, if you see or hear

5    something that you believe to be in violation of the terms and

6    conditions set forth by the court, that we need to call the

7    court and report him.

8    Q.  Would you have any problem with that?

9    A.  No.

10   Q.  You say that emphatically.

11   A.  I guess that did come out rather emphatically, yes.

12   Q.  What I mean is that despite the fact that you know

13   Mr. Beals and he's your friend, you are willing to do that?

14   A.  Yes.

15   Q.  Now, tell me a little bit about your relationship with him.

16   How did you meet him?

17   A.  Much like Mr. McRee, I met Mr. Beals on the corner in the

18   Sunrise and Swan area 20-plus years ago.

19   Q.  Okay.  Were you neighbors?

20   A.  No.  We live in close proximity but not what one would call

21   neighbors, meaning, oh, the man who lives across the street.

22   In this case, it's, oh, the man I see at the restaurant, the

23   dry cleaner, the supermarket, and share a beer with at the bar

24   every now and then who lives one to two miles away.

25   Q.  Okay.  And that was -- are the origins of your

DIRECT EXAMINATION - KAROL WALDRON                              63

1   relationship?

2   A.   Correct.

3   Q.   How far do you live from him now?

4   A.   One mile, one and a half miles.

5   Q.   All right.  And you've related to me that you view him like

6   a father figure?

7   A.   I do.  Over the course of many years, what started out as

8   just having a drink occasionally, Mr. Beals most definitely

9   took me under his wing when I was much, much younger.  He was

10   something of a mentor to me and over the course of many years

11   we've become great buddies and, if you ask me today, yes, I

12   often refer to myself as his surrogate daughter or vice versa,

13   I call him my surrogate father.

14   Q.   He's somebody that you look up to?

15   A.   Yes.

16   Q.   You find him to be a man of integrity?

17   A.   Very much so.

18   Q.   We heard some information proffered last week when

19   Mr. Schlosser was here that you are now his successor trustee?

20   A.   Yes, that is correct.

21   Q.   And he trusted you enough to name you as a successor

22   trustee?

23   A.   Correct.

24   Q.   And his trust is substantial?

25   A.   I'm finding out.

1   Q.  There's quite a bit of money?

2   A.  Yes.

3   Q.  All right.  And so you've taken on those responsibilities I

4   know for a fact quite seriously?

5   A.  Yes.

6   Q.  All right.  And you also have his power of attorney?

7   A.  I do.

8   Q.  All right.  You're paying his bills?

9   A.  Yes.

10  Q.  You mentioned to me something about these girls in

11  Argentina.

12  A.  Uh-huh.

13  Q.  Have you -- have you confirmed that they exist and that

14  you've spoken to them?

15  A.  Uh-huh, absolutely.  Not that I ever had a doubt that they

16  existed.  Mr. Beals has traveled for years to Argentina for

17  leisure purposes and over the course of many years has

18  developed friendships and the likes down there.

19      Most recently, this is probably within the last year, year

20  and a half or so, there were two young girls that were orphaned

21  by their mother.  Their mother was a friend of Mr. Beals and he

22  feels very responsible for these two girls.  Yes, they

23  absolutely exist.

24      Because of this odyssey that we have been on over the

25  course of the last eight days, if you will, I have had to reach

1  out to them via email to, number one, let them know that

2  Mr. Beals is okay.  They're aware that he's very, very sick and

3  he's highly communicative with them, so I wanted them to know,

4  number one, he's okay, he's fine, end of story and, yes, I have

5  made sure that in Mr. Beals' absence they are being provided

6  for.

7  Q.  Okay.  It sounds like he's got a tender side to him with

8  regard to these girls?

9  A.  Most definitely.

10  Q.  And he seems to care about them very much?

11  A.  Very much.

12  Q.  Just in your opinion and knowing him as well as you do, do

13  you think he would do anything to jeopardize that relationship?

14  A.  No, absolutely not.

15  Q.  I should say intentionally because he has --

16  A.  Right, right.

17  Q.  Now, are you aware of his physical condition?

18  A.  I am.

19  Q.  And how are you aware of his -- well, what is his physical

20  condition as far as the medical problems go?

21  A.  Sure.  In order to answer that question, I need to explain

22  how this medical episode began and what my knowledge is of

23  that, is that okay?

24  Q.  It's okay with me if it's okay with everybody else.

25  A.  Perfect.  Okay, thank you, Your Honor.

DIRECT EXAMINATION - KAROL WALDRON

1          THE COURT:  Go ahead.

2          THE WITNESS:  So Mr. Beals has had this -- it sounds

3    like a stuffy nose or congestion for probably close to a year

4    and it's become increasingly worse and what we know is that

5    with his international travels, every time he travels and gets

6    on planes there, too, it seems to get worse.  And after this

7    last trip this summer in Europe, he reached out to me from

8    Europe and said:  You need to help.  I'm coming home in a few

9    days but find me a doctor.

10         So I found him a doctor.  He reached out and although ended

11   up ultimately with a different doctor, ended up at what's

12   called an otolaryngologist, which is an ear, nose, throat

13   doctor.  He saw a doctor by the name of Thomas Kang, who is an

14   ear, nose, throat doctor.  And after a couple of visits, they

15   sent him for a CAT scan.  The CAT scan revealed a mass in his

16   head.  It's out of Dr. Kang's area of expertise so then we were

17   referred to Dr. Chang at UMC, at Banner.

18         We had a pre -- well, we had a consult with Dr. Chang and

19   his team three or four weeks ago.  Ballpark.  And it was at

20   that time that Dr. Chang advised us that this mass in his head

21   is very large.  That regardless of what it is, he will need to

22   have surgery.

23   BY MR. LABER:

24   Q.  Okay.  But you were present when the doctor said this?

25   A.  Absolutely, I was there.

DIRECT EXAMINATION - KAROL WALDRON                    67

1   Q.  And did you take him to the doctor?

2   A.  I did -- well, no.  He drove the Buick but, yes, I

3   essentially took him.

4   Q.  When we met when this started, you brought me a couple of

5   emails.

6   A.  Uh-huh.

7   Q.  And a document that looks like there, this is a picture

8   of --

9   A.  Correct.  That's the CT image that I sent to you.

10  Q.  Okay.

11          MR. LABER:  Your Honor, may I approach?

12          THE COURT:  Sure.

13          MR. LIZANO:  You know, I think that's the same --

14          MR. LABER:  It's in the emails.

15          MR. LIZANO:  Yeah, I've seen this.

16  BY MR. LABER:

17  Q.  So let me show you what's been marked as Exhibit A.

18          MR. LABER:  And may I stand up here?

19          THE COURT:  Yeah, just kind of use the microphone.

20  BY MR. LABER:

21  Q.  Okay.  So this is an email, right, is that what that is,

22  Exhibit A?

23  A.  This is an official document that we received from UMC,

24  from University Medical.

25  Q.  Okay.  When you say "we" received it, did you receive a

DIRECT EXAMINATION - KAROL WALDRON                    68

1    copy of it yourself?

2    A.  Yes.  We received a hard copy the day we left that consult

3    that I mentioned; this is what we received.

4    Q.  Okay.  And it shows that he's on various medications?

5    A.  Correct.  These are his current medications.

6    Q.  Okay.  He's on Lipitor, he's on Cardizem, Glucotrol,

7    Hydrodiuril, Flomax.  So those are the medicines that he's on,

8    correct?

9    A.  Correct.

10   Q.  And on the second page of Exhibit A, what does that say

11   right there?

12   A.  Right.  It says:  We have held 9/12/16 -- meaning

13   September 12th -- as a surgery date.  We will further discuss

14   this at your next appointment.

15          MR. LABER:  And if I may move for admission of A, Your

16   Honor?

17          THE COURT:  Any objection, Mr. Lizano?

18          MR. LIZANO:  No objection.

19          THE COURT:  Yeah, Exhibit -- that's A?

20          MR. LABER:  Yeah.

21          THE COURT:  Okay.  Exhibit A is admitted.

22   BY MR. LABER:

23   Q.  And here we have Exhibit B, which is actually an email of a

24   thread that you wrote to me.  But on the second -- this is an

25   email, correct?

1   A.   Yes.

2   Q.   And what's the date of the email from --

3   A.   The date I sent this to you?

4   Q.   No, the date that you got something from the doctor.

5   A.   Tuesday -- well, it's regarding an appointment on Tuesday,

6   September 6th.

7   Q.   Okay.  And was he supposed to have an appointment at some

8   point to visit with the doctor?

9   A.   Yes, absolutely.  So in between the consult I just

10  mentioned and a week ago Tuesday, I was traveling on business

11  and Mr. McRee took Mr. Beals for an MRI that the doctor

12  ordered.  The doctor wanted additional information about this

13  mass before the final surgical consult.  The final surgical

14  consult was supposed to occur a week ago Tuesday, which I

15  believe is the 6th, correct?  Mr. Beals and I were headed out

16  the front door of his house for that surgical consult when we

17  were greeted by the FBI agents.

18  Q.   So obviously you didn't get to go to his --

19  A.   Correct.  We have missed the surgical consult.

20  Q.   The consult was the 6th?

21  A.   Yes.

22  Q.   And he was supposed to have surgery --

23  A.   Yesterday -- Monday, Monday the 12th, yes, sorry.

24  Q.   Now, I'm going to show you what's been marked as Exhibit C.

25  A.   Uh-huh.

1   Q.  Have you seen that?

2   A.  Yes.

3   Q.  What is that?

4   A.  It's a CAT scan of Mr. Beals' head.

5   Q.  Was that presented to you by the doctor?

6   A.  Yes.

7   Q.  Did the doctor tell you what that CAT scan represented?

8   A.  Yes.

9   Q.  What?

10  A.  It's a tumor; a tumor is synonymous with a mass.  It is in

11  his sinus cavity and has engulfed his sinus cavity.  It has

12  breached the nasal cavity, is breaching into the other nasal

13  cavity.  There are pressures against what they call the ocular

14  wall, which is the bone separating it from the eye.  And

15  apparently this bone here, meaning the tumor, is pressing up

16  against his brain.  We don't know at this point to what degree

17  the brain or the eye have been compromised.  We were going to

18  find out the MRI results that day.

19  Q.  And was it -- did the doctor give you an impression as to

20  how urgent surgery -- how quickly he needed surgery?

21  A.  Not in specific terms.  He mentioned, yes, absolutely we're

22  headed for surgery.  And he felt it was important enough and

23  severe enough that, even without the MRI and the additional

24  information, he scheduled the surgery during our first consult

25  and said you need to get in there on the 12th.

 1   Q.  All right.  And since you're spending time with Mr. Beals,

 2   do you see that he's in discomfort?

 3   A.  Oh, of course, yes.

 4   Q.  His nose is running --

 5   A.  And his eyes are weeping and he's mentioned to me over the

 6   phone that the headaches are getting worse.  I know he has some

 7   double vision and, at least in my estimation, it appears as

 8   though this medical situation is becoming more serious.

 9           MR. LABER:  So I'd move for the admission of C as

10   well.

11           THE COURT:  I'm sorry.  Did you move B as well?

12           MR. LABER:  Move A, B, and C.

13           THE COURT:  A, B.  And C.

14      Mr. Lizano?

15           MR. LIZANO:  No objection.

16           THE COURT:  Okay.  A, B, and C are all admitted.

17   BY MR. LABER:

18   Q.  I also discussed with you whether or not you'd be willing

19   to post a what's known as a signature bond where you would sign

20   for a sum of money.  We discussed $5,000.  And if he runs away

21   or doesn't show up for court, you could be held liable for that

22   money.

23   A.  Yes.

24   Q.  Is that the way I explained it to you?

25   A.  That is the way you explained it to me.

DIRECT/CROSS-EXAMINATION - KAROL WALDRON                72

 1    Q.  Do you have enough confidence in Mr. Beals that you would

 2    be willing to sign personally and be personally liable for

 3    $5,000 in the event that he didn't do what he was supposed to

 4    do?

 5    A.  Yes.

 6              MR. LABER:  That's all I have, Your Honor.

 7              THE COURT:  Thank you.

 8         Mr. Lizano?

 9                         CROSS-EXAMINATION

10    BY MR. LIZANO:

11    Q.  So, Ms. Waldron, it's -- the impression I was getting from

12    your testimony is that you care very much about Mr. Beals.

13    A.  I do.

14    Q.  Is that fair to say?  Yes.  Okay.

15         So remind me again, how did you meet Mr. Beals and what

16    were the circumstances of that?

17    A.  It was more than 20 years ago that I met Mr. Beals, again,

18    in the neighborhood.  I honestly don't remember the exact

19    moment I met Mr. Beals.  He's just been there for the vast

20    majority of my adult life.  Over the course of time, we've

21    developed a very close relationship.  We talk at least every

22    other day or email every other day, have dinner once or twice a

23    week, that kind of thing.

24    Q.  And how much detail has he gone into with you about these

25    issues and his statements and his beliefs about the Mormon

CROSS-EXAMINATION - KAROL WALDRON                    73

1    church and these individuals that he believes have wronged him?

2    Has he talked to you about that?

3    A.  Yes.

4    Q.  And what do you think about that?

5    A.  Well, I don't want to say as long as I've known Mr. Beals,

6    but certainly at least for the last ten years, I can say that

7    Utah has been there.  What I mean is that he's had

8    conversations with me about it and I can't connect the dots.

9        Generally speaking, I'm -- I'm dismissive of those

10   conversations.  They account for such a small part of our

11   conversations that it's just -- it's just Beals.  Something

12   happened 30 years ago, and I get the impression that Mr. Beals

13   feels wronged by it.  Something failed him.  And it's just a

14   thorn in his side that's ongoing.

15   Q.  And he doesn't go into -- I guess what I'm understanding

16   from you is that he just doesn't go into detail with you about

17   it either because you don't want to hear about it or he just

18   doesn't do it, I don't know, you tell me?

19   A.  Well, I think it's a combination of both.  Sure, I've

20   listened to it at times.  I don't necessarily understand it,

21   because the way it's explained to me, it's really complicated.

22   I am aware that something happened in Utah, call it a business

23   dealing, and there was a resulting trial or court case, some

24   legal matter.  Again, Beals feels wronged.

25       I am aware of the interstate phone threat that he made and

CROSS-EXAMINATION - KAROL WALDRON                    74

1   I believe that's why he was previously sent to jail, if I'm not

2   mistaken, is that he threatened someone over a phone.  I might

3   be wrong on that, but that's my understanding.

4       Again, it's 30 years ago.  It's before I met Beals.  It's

5   just white noise in the background.  It's not part of my daily

6   conversations.

7   Q.  So have you been copied on some of the emails that

8   Mr. Beals has sent?

9   A.  I'm one of the many, many people on those emails, yes.

10  Q.  And so have you told him to stop sending those emails?

11  A.  I think, here, too, if I had to hazard a guess, these

12  emails have probably been happening for four or five years,

13  something along those lines.

14  Q.  Can I stop you there because my question was:  Have you

15  told him to stop sending the emails?

16  A.  I can't firmly say yes to that.

17  Q.  Okay.  And do you -- do you read the emails that -- those

18  types of emails that he sends or do you just delete them?

19  A.  In the beginning, sure, it was an email coming in for

20  Mr. Beals so I'll open it and then you realize it's just

21  nonsense and you delete it.  And over the course of the years

22  since these emails have continued, I've, for the most part,

23  just generally dismissed them.  It's just worthy of an eye

24  roll:  There goes Beals.

25  Q.  Right.  So when you came to court and you heard about the

CROSS-EXAMINATION - KAROL WALDRON                    75

1    specific threats to kill Neil Crist and shooting the mother

2    MF'ers, don't you find that disturbing?

3    A.  Again, I have opened some of these emails and I do know

4    Mr. Beals so I have been exposed to that language before.  Is

5    it jarring to hear a federal agent read things like that?  Yes,

6    of course it is.  I mean -- it's foul and it's unbecoming.  But

7    at the same time, it's just Beals.  It's just -- again, I don't

8    view him as a threat, therefore, I don't take any of these

9    emails seriously.

10   Q.  But it's fair to say that he might not have been sharing

11   every part of his life with you; is that right?  I mean, in

12   terms of what -- I mean, you just testified that he really

13   hasn't gone into a lot of detail about these -- about these

14   events, you know, or -- and when he has, you kind of put it to

15   one side or try to, you know, delete it or just, you know,

16   "that's just Beals" I think were the words that you used,

17   right?

18   A.  I don't -- how about this?  I think I probably know as much

19   or more than anyone.  It's not that he hasn't talked to me

20   about these things and socialized these ideas with me.  It's

21   that it just -- again, it's such a small fraction of our

22   conversations and who I believe Beals to be.  It just seems --

23   it has seemed inconsequential; therefore, I just, I don't know,

24   dismissed a lot of the details.

25        Yes, I'm aware that there were -- there was language that

1  would sound threatening to somebody who doesn't know him, both

2  in emails and conversation, but, again, from my perspective

3  that's just not the case.

4  Q.  I mean, is it fair to say, you know, maybe he hasn't

5  directed any of that at you personally but, I mean, you're

6  aware of him directing those types of threats, animus, towards

7  other people, right?

8  A.  I am.

9  Q.  Right.  And, I mean, you don't approve of that, do you?

10  A.  No, I do not.

11  Q.  Right.  When did you become -- when did you receive power

12  of attorney over Mr. Beals' estate?

13  A.  Bear with my ignorance.  Probably -- I think in theory I've

14  had power of attorney for a couple of years or several years,

15  if I'm not mistaken.  Certainly I've had medical power of

16  attorney at least for three or four years.  Mr. B and I have

17  had conversations about legal matters and, in the event

18  something happens, he trusts me to take care of him.

19      I think you're referring to the more recent chain of

20  events?

21  Q.  Well, I was going to get to that.  But so the power of

22  attorney over the medical -- the medical guardianship, that's

23  essentially a couple of years old; is that fair to say?

24  A.  At least, yeah.

25  Q.  So let's talk about, I guess you were named as the

1    successor trustee of one of Mr. Beals' trusts; is that right?

2    A.  Correct.

3    Q.  Okay.  And when did that happen?

4    A.  Friday, September 9th.

5    Q.  Okay.  Whose idea was that?

6    A.  Paul Schlosser, who is Mr. Beals' estate attorney who was

7    here last week also.

8    Q.  Are you a beneficiary under the -- of any of Mr. Beals'

9    trusts?

10   A.  No, I'm not named as a beneficiary.

11   Q.  Do you have any financial relationship with Mr. Beals at

12   all?

13   A.  No.  However, as my boss says, finger in the air, because

14   of the recent chain of events, I went to Mr. Beals' regular

15   bank, Wells Fargo, on Saturday and put myself as power of

16   attorney on his checking account so that I can pay the bills

17   and take care of keeping the lights on at the house while we're

18   clearing this up.  So I am involved in his finances from that

19   standpoint.

20   Q.  Okay.  Are you taking any compensation to run -- to act as

21   the successor trustee?

22   A.  No, I'm not.

23   Q.  Yet -- Mr. Laber spoke to you a little bit about some of

24   the obligations of a third-party custodian.  But, I mean, it's

25   not just -- if one of the conditions that was imposed was that,

CROSS-EXAMINATION - KAROL WALDRON                    78

1   for example, that Mr. Beals can no longer send emails during

2   the pendency of this case, would that alter your willingness to

3   serve as his -- as a third-party custodian for him?

4   A.  No.

5   Q.  If Mr. Beals asked you for a sum of money, would you --

6   would you provide it to him even if you'd been ordered by the

7   court not to -- not to give beyond a certain amount per month?

8   A.  I would do up to whatever the amount the court permitted

9   per month.  Anything over that, absolutely not.

10  Q.  And what would you do if Mr. Beals started sending you

11  emails directing his vitriol at you?  Have you given any

12  thought to that?

13  A.  I don't believe that would ever happen.

14  Q.  What if it did?  What would you do?

15  A.  I can't -- it's so beyond my realm of comprehension.  If he

16  directed vitriol at me, depending on whether or not I'm a

17  custodian, if I'm a custodian, I need to report that kind of

18  behavior to the court, I would report it to the court.  If he

19  directed some kind of vitriol at me, then I would pick up the

20  phone and probably tell him:  Knock it off.

21      But, again, it's not going to happen.  We don't -- we've

22  gone toe to toe about a few things, but usually it's about how

23  to make mashed potatoes, not about trusts.

24  Q.  Did Mr. Beals ever tell you about his criminal history?

25  A.  Yeah, yes.

CROSS-EXAMINATION - KAROL WALDRON                            79

1    Q.   And when did he tell you that?

2    A.   At least ten years ago I became aware of it, probably

3    longer.

4    Q.   Okay.  So what do you know about his criminal history?

5    A.   That something happened in Utah.  As a result, he felt

6    wronged.   He committed, I believe -- conducted an interstate

7    phone threat and threatened someone.  And I believe that's the

8    reason for which he was convicted and incarcerated.

9         Mr. Beals has told me that there's something in this about

10   a forgery, something about stock certificates, forgeries, but

11   that's the end of my knowledge of that.

12        I do remember that he had a DUI, and that would have been

13   ten or more years ago.  And I think that's probably the extent

14   of what I know other than here today.

15   Q.   So he didn't tell you about his arrest in 1981, he's never

16   mentioned anything about that?

17   A.   I don't know what the arrest in 1981 is regarding.  If it

18   has to do with an interstate phone threat, Utah, forgery, it's

19   possible.

20   Q.   No, it's something else.  So he didn't tell you about that,

21   okay.

22        He didn't tell you about his arrest in 1982 for another

23   offense?

24   A.   What offense?

25   Q.   He didn't tell you in 1982 about another offense?

1    A.  He did not specifically tell me that an offense occurred in

2    the year of 1982.  It is conceivable I am aware of the offense

3    but not the year in which it occurred.

4    Q.  Okay.  And did he tell you about -- that he's been taken

5    into custody for probation violations?

6    A.  No, no, I don't believe so.

7            MR. LIZANO:  Okay.  I have no further questions.

8                      REDIRECT EXAMINATION

9    BY MR. LABER:

10   Q.  As far as being a successor trustee, even though you became

11   a successor trustee on Friday, you were actually named in the

12   trust as the successor trustee if he became incapacitated or

13   unable to take care of the affairs?

14   A.  Correct, yes.

15           MR. LABER:  That's all I have.

16           THE COURT:  Ma'am, were you aware that Mr. Beals was

17   convicted of extortion in Arizona in 1987 and sentenced to five

18   years in prison?  Is that one of the criminal -- were you aware

19   of that criminal conviction?

20           THE WITNESS:  No, I don't believe so.

21           THE COURT:  And then what's your understanding of the

22   phone threat conviction as to whether he had jail time?

23           THE WITNESS:  I believe that it was similar to what

24   we're discussing here today, that verbally over a phone and

25   over state lines he made some sort of comment about "I will

                    UNITED STATES DISTRICT COURT

1    kill you" to someone.  But it was verbal though.

2            THE COURT:  Okay.  And then, you had described the

3    emails, at least to you, as kind of nonsense, him being Beals.

4    But is it fair to say that the issues raised in these emails

5    don't appear to be nonsense to Mr. Beals?

6            THE WITNESS:  Yes, that's correct.

7            THE COURT:  Okay.  And let me -- were you -- as far as

8    you know, were you copied on all these emails?  I mean, I think

9    you were here when the probation officer testified that he

10   counted up about 450 emails over the last five years or so.  Do

11   you think you got that many as well?

12           THE WITNESS:  If not that many, probably close to it.

13           THE COURT:  Okay.  And I did the math quickly, and I'm

14   no mathematician but it looks like Mr. Beals was sending one of

15   those emails every four to five days over five years.  Does

16   that sound right?  I mean, did you get an email with these kind

17   of rantings every --

18           THE WITNESS:  Week or so.

19           THE COURT:  -- every week or so?

20           THE WITNESS:  Yes, yeah.

21           THE COURT:  But, I mean, how often did you discuss

22   with him -- I mean, would it just be like, well, that's another

23   email delete, or did you ever have a conversation with him

24   where you either tried to talk him down or discuss the issues

25   with him?

1          THE WITNESS:  Well, I think those are two separate

2   answers.  If we're talking about the emails specifically, I

3   generally disregarded them because, again, to me it's nonsense,

4   delete, move on.  And this has been happening for an extended

5   period of time.  So, again, because of the extended period of

6   time, I've just disregarded it on and on.

7       We have had conversations, and apart from the emails, but,

8   sure, talking to Mr. B every -- every other day, four or five

9   times a week, having dinner a couple of times a week, it comes

10  up.  And more often than not, like Jim said, you just let him

11  go for a couple of minutes and say:  Okay, okay, just put it to

12  bed.

13      You know, I have expressed to him verbally that he needs to

14  let this go, that this isn't healthy.  And as has been said

15  here, it seems as though over the last couple of years this has

16  become more so a thorn in his side, and I think everybody who

17  knows him, not just the people here today who love him, but

18  we've all said:  Just move on.

19          THE COURT:  Any insight as to why he can't let it go

20  and move on?

21          THE WITNESS:  It's personal.  It's almost like he's

22  trying to restore his honor.  This isn't about trying to get a

23  financial award.  Somebody said something about he believes

24  there's money owed to him.  He's said things like that to me,

25  too.  But I don't think that's what this is about.  It's --

```
1    it's very personal.  And he feels as though he wants to fix

2    this, fix it while he is still on this earth.

3              THE COURT:  In the conversations you've had with

4    Mr. Beals about the subject of his emails, to the extent he

5    feels he's been wronged, has he ever expressed in those

6    conversations, the same sentiments he did in some of the emails

7    about wanting to hurt someone or shoot someone?

8              THE WITNESS:  No, no.  The conversations are much more

9    that -- to cite a specific example, he feels as though some

10   material evidence was withheld from a case in Utah and he wants

11   a sealed file, some evidence, some something to come out that

12   will blow the lid off of this and restore his honor.

13             THE COURT:  Okay.  Are you willing -- I know Mr. Laber

14   asked you about willingness and he asked Mr. -- I forgot his

15   name already -- McRee if he's willing to sign a personal

16   appearance bond.  Would you be willing to post a cash bond that

17   would -- basically, you'd be putting up money saying you're

18   confident that Mr. Beals is going to abide by all his release

19   conditions?

20             THE WITNESS:  Yes, absolutely.

21             THE COURT:  Okay.  Thank you.

22       Mr. Laber or Mr. Lizano, any questions as a result of my

23   questions?

24             MR. LIZANO:  Yeah, just one question, that's all I

25   have.
```

```
 1                      RECROSS-EXAMINATION
 2   BY MR. LIZANO:
 3   Q.  Do you know Mr. McRee?
 4   A.  I do, I do.  We met Mr. Beals around the same time.
 5   Q.  All right.  So is it fair to say that all three of you are
 6   friends?
 7           THE COURT:  I'm sorry.  You said one question -- it's
 8   never one question.
 9   BY MR. LIZANO:
10   Q.  Well, fair to say all three of you are friends, you,
11   Mr. Beals, and Mr. McRee?
12   A.  He is friends with Mr. Beals, I am as well.  My
13   relationship with Mr. McRee is really limited.  We were really
14   close back years ago before, you know, we all got on with our
15   lives and he got married and had kids.
16       Prior to this taking place, it's been probably two or three
17   years since I've talked to McRee.
18           MR. LIZANO:  Okay.  Thank you.
19           THE WITNESS:  Yeah, sure.
20           THE COURT:  Thank you, Ms. Waldron.  We appreciate it.
21           THE WITNESS:  No, thank you, Your Honor.  I appreciate
22   it.  And I'm sorry about the water all over.
23           THE COURT:  Oh, don't worry about it.  The rug will
24   soak it up.
25       Mr. Laber, any other witnesses?
```

```
 1            MR. LABER:  No, Your Honor.  My client knows that he
 2   had a right to testify; he's chosen not to, which I think was a
 3   wise decision.  So we rest.
 4            THE COURT:  Okay.  I'm happy to do -- let me tell you
 5   at the outset so you guys can tell me what you want to do, I do
 6   plan to take this under advisement.  The question I have is
 7   whether you all want to submit -- if you want to argue it today
 8   or if you just want to submit something in writing.  But I
 9   don't care either way.  It's up to you guys.
10            MR. LIZANO:  Well, I think maybe submitting something
11   in writing might be the better way to go.
12            MR. LABER:  Well, Your Honor, maybe just the
13   memorandum.
14            THE COURT:  Right, I did get your memorandum and
15   that's fine.  You don't have to submit anything further.
16            MR. LABER:  I would like to argue today.  I mean, I
17   filed a memorandum and, in all fairness to him, you know, if he
18   can do it relatively soon, I don't have an objection if he
19   wants to file his own memorandum but I would like to argue a
20   few things today.
21            THE COURT:  Okay.  Let me do this, let's take a
22   five-minute recess and I'd like to talk to the pretrial officer
23   for a moment and then we'll come back out and hear argument,
24   okay?
25            MR. LABER:  Okay.
```

1          THE COURT:  So, thank you.

2      (A recess was taken.)

3          CLERK:  We're back on the record in CR 16-1663, United

4    States of America versus Richard Corrie Beals.

5          THE COURT:  Okay.  So, Mr. Lizano, did you want to be

6    heard?

7          MR. LIZANO:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. LIZANO:  May I approach the podium?

10         THE COURT:  Yes, absolutely.

11         MR. LIZANO:  Before I begin, I was talking with

12   Mr. Laber before the court came back in session about possibly

13   submitting something later in the week in writing.  I may or

14   may not do that now that I think about it and talked through it

15   with Mr. Laber.  I probably won't.  But, anyway, I just wanted

16   to bring that up before I begin with my argument.

17         THE COURT:  And I appreciate it.  And I should say

18   candidly I've gone back and forth as to whether I'm going to

19   make a decision today or not.  I feel like a tennis match I've

20   gone back and forth so much.  But so just to let you know that

21   for purposes of your arguments, so you can be thorough in the

22   event that I do decide to make that decision today.

23         MR. LIZANO:  Sure.  Okay.

24      Well, Your Honor, for the very first thing that I want to

25   address, which I think is kind of the elephant in the room is

1    Mr. Beals' health situation.  You know, regardless of what he

2    may have done in the past and what he's charged with now, you

3    know, I want the court to know and I want Mr. Beals to know

4    that we do take his health concerns seriously and we're not

5    being cavalier about -- about the issues that he's facing and

6    we understand that it's serious.

7        But we do believe, and quite strongly, that the court can

8    make reasonable accommodations for that while still detaining

9    him.  The idea that we would propose is, to the extent

10   Mr. Beals needs to go for a preoperation, you know, counseling

11   meeting with his physician, his surgeon, and then obviously to

12   the extent he has to have his surgery, to allow him to do that

13   under, you know, essentially being escorted there by the US

14   Marshals for the premeeting, escorted there and back once he's

15   finished, and then with the surgery obviously giving him

16   whatever time is necessary for him to be -- to recover from his

17   surgery, and then being escorted back by the US Marshals to

18   custody.

19       So we're not trying to, you know, deprive somebody who

20   needs medical care of that care.  We just think that there's a

21   way to do it while still addressing the very serious concerns

22   that we have about Mr. Beals as a danger to the community as

23   well as, secondarily, the flight risk that we believe he poses

24   as well.

25       So, you know, I'll start off by saying that we do -- we do

strongly believe that Mr. Beals, that there is clear and

convincing evidence that Mr. Beals is a danger to the community

as well as, again, secondarily, a flight risk.  And the way I

usually do detention hearings, which is maybe a little bit too

analytical sometimes, but I do try to go factor by factor

because Congress has given us a framework to use in order to

assess these issues.

And so, you know, where I'll start is 3142(g)(1), which

talks about the nature and circumstances of the offense.  I'd

submit to the court, Your Honor, that this factor weighs in

favor of detention in this case.  It's undisputed both -- I

think Mr. Laber conceded the point in the filing that he

submitted to the court that this is a crime of violence for

purposes of the Bail Reform Act because the crimes alleged do

have as an element the threatened use of physical force against

the person of another.

There's also a case that I located where it says in dicta

that Section 875 violation, transmitting threatening

communications constitutes, quote, a crime of violence under

the Bail Reform Act.  That's United States v Petersen, which is

557 F. Supp. 2d 1124.  And then the pincite is 1126 at footnote

one.  And that's a decision out of the Eastern District of

California from 2008.  And, again, it was dicta but they did --

they did mention that.

And that's important because a crime of violence is one of

1    the specifically enumerated offenses that are listed in that

2    subsection about what constitutes or what is to be considered

3    in terms of the nature and circumstances of the offense.  So

4    I'd submit that that factor weighs in favor of detention

5    because it is a specifically enumerated example of a type of

6    offense that would warrant detention in a particular case.

7        Let me just get my code book one second.  I'll be right

8    back

9            THE COURT:  Sure.

10           MR. LIZANO:  The second factor, and Mr. Laber goes on

11   at some length about this in the filing that he submitted, is

12   the weight of the evidence.  As the court is, I'm sure, very

13   well aware, it's the least important factor in the detention

14   analysis.  And, as the court knows, primarily because this is

15   not the forum to litigate the merits of the case.  I mean,

16   obviously if Mr. Beals wants a trial, he'll have one, and

17   that's the time to litigate the ins and outs of that.  But so

18   it is the least important factor but I still do think that this

19   factor, too, weighs in favor of the government and in favor of

20   detention.

21       Why do I say that?  Well, a couple of reasons.  First, I

22   believe that, you know, obviously the standard for a grand jury

23   indictment is probable cause.  It's not the same thing as

24   beyond a reasonable doubt but a grand jury, when presented with

25   the evidence in this case, did find probable cause to issue the

1    indictment and that has occurred and so there is reason to

2    believe that he committed the offense in question.

3        And that -- I'll just pause there.  That somewhat

4    distinguishes this type of case from many of the cases which

5    the court tends to hear where the individuals are brought in on

6    a complaint and there hasn't been an indictment issued yet.

7        There's also, you know, just in terms of to get into the

8    merits of the case a little bit.  There's the -- there doesn't

9    seem to be any dispute that Mr. Beals is the one who sent the

10   communications in question.  He essentially admitted during his

11   interview with the FBI in January of 2016 that he sent emails

12   from his home computer in his home.  I think he pointed to it

13   when the FBI agents were interviewing him.

14       Also, in terms of for potential 404B evidence in this case,

15   Mr. Beals has been convicted in the past of essentially

16   substantively identical conduct.  So in terms of trying to

17   prove his state of mind, which obviously is a critical issue in

18   this case, we do have that, as well as potential evidence of

19   his intent in the case.

20       And as well as during the FBI interview, which arguably was

21   an opportunity for Mr. Beals to talk himself out of a

22   prosecution, instead he used it as an opportunity to

23   essentially clarify his state of mind and, you know, among

24   other things -- and the court has the transcript of the

25   interview but, you know, he said that he understands what the

1    law is, you know.  He seemed to be pleased when he was told

2    that his emails might inspire a reaction of fear on the part of

3    recipients.  I think his words were, "good, good", and then

4    followed on were, you know, about what his intent was

5    essentially, and he said exactly that.  I forget the exact

6    quote but it's in there in the same paragraph.

7        He referred to his emails multiple times as containing, in

8    his words, veiled threats and in his mind, I guess, there's

9    some sort of distinction between a veiled threat and an actual

10   threat but he is admitting that they are threats.

11       And so I think there is -- there is good evidence already

12   at this stage of the case to establish what Mr. Beals' state of

13   mind is or was at the time that he sent the emails of what he

14   intended to accomplish by sending them.

15       Now, what I want to focus on in particular in this part of

16   the analysis is, you know, Mr. Laber essentially is -- even

17   though he frames it as, well, the government can't prove that a

18   true threat was made and essentially that what I'm

19   understanding the argument from the defense, at least at this

20   point, is, well, you know, the government doesn't have any

21   evidence that a reasonable person would have understood it as

22   such in the context, you know, as a threat in context.  But I

23   guess I'll say a couple of things about that.

24       First, I don't think anybody's saying that the government

25   has to prove that Mr. Beals' actually intended to carry out his

1    threats in order for him to be guilty of making threats.  I

2    don't think that's the standard and I don't think the defense

3    is arguing that.  So to the extent that, you know, there's been

4    much evidence presented obviously over the last two hearings

5    we've had on this about whether Mr. Beals would be likely to

6    actually go to Utah for purposes of proving the charge, that's

7    not -- that's not relevant to proving the charge in question.

8           But in terms of whether or not --

9           THE COURT:  I'm sorry.  I guess -- so, I'm sorry.

10   Help me understand that argument.  So you're saying, at trial,

11   you wouldn't necessarily have to prove that he would actually

12   follow through and go to Utah?

13          MR. LIZANO:  Right, yeah.  That's not an element of

14   the offense.

15          THE COURT:  Okay.  But, I mean, isn't that -- that

16   might not be an element of the offense but isn't that like a

17   pretty big factor in the detention analysis, whether he'd go?

18          MR. LIZANO:  Well, I'm only bringing it up in the

19   context of the weight of the evidence, that particular factor.

20   I mean, I will touch upon that aspect.  I can do it right now

21   actually.

22     I mean, one of the things that's been highlighted over the

23   last two hearings is, well, you know, there's no, at least from

24   the defense's side, well, Mr. Beals isn't going to actually

25   carry out any of these threats, he's just venting, et cetera,

1    et cetera.  But that really misunderstands the danger to the

2    community that he poses because the danger isn't just that he

3    will actually go out and hurt somebody.  We have that concern,

4    and I'm going to be continuing to argue that at the end of my

5    argument.  However, merely by sending these emails, after being

6    told to stop multiple times over many years, merely by sending

7    harassing and threatening correspondence, that, in itself, is

8    -- is a danger to the community.

9        He can't help himself from sending these emails.  I mean, I

10   think that's beyond question.  I mean, his history is that he's

11   got decades -- he's been told to stop.  The FBI came to his

12   house and told him:  Do not do this.  Do not send harassing and

13   threatening correspondence to any other people.  And then eight

14   months later he goes and he sends the email to Judge Jenkins,

15   you know.

16       And obviously, you know, there was in the -- in the

17   interview with the FBI agents where he talks about the

18   magistrate judge in a prior case, Judge Alba, and Judge Alba

19   had told him -- he conceded in the interview that:  Judge Alba

20   told me not to send these emails.  And the very next statement

21   was:  F Judge Alba.  You know.  So there's no reason to

22   believe, you know, based upon his prior history that he's going

23   stop sending these emails.  And these emails themselves are --

24   are evidence of the danger to the community that he poses.

25       And --

UNITED STATES DISTRICT COURT

```
1              THE COURT:  How is that a danger?  Are you saying the,

2    kind of the psychological toll it takes on the folks he's

3    sending these to and creating fear?

4              MR. LIZANO:  Yeah.  I mean, people have a right to be

5    free from his -- his harassing correspondence.  I mean, it's

6    incessant.  I mean, he keeps on sending these emails and he

7    won't stop, even though he's been told to stop.

8              THE COURT:  Have any of the victims of this offense,

9    which I guess would be the email recipients, have they weighed

10   in on concerns they have?  Has the government been in contact

11   with any of those folks?

12             MR. LIZANO:  Yes, yes.  You know, I don't want to

13   misrepresent anything because I don't remember exactly off the

14   top of my head but, I mean, I think it's a fair statement to

15   say that everybody is concerned about this and nobody -- I

16   mean, nobody wants to be a recipient of an email or be told

17   about an email where some individual is threatening to kill

18   them.  I mean, I think that's uncontroversial.

19             THE COURT:  Right.  Is the concern, as far as you

20   remember, that Mr. Beals may act upon this or that they may

21   keep getting these emails with the threats or both?

22             MR. LIZANO:  I'd say -- I'd say both.  Again, I don't

23   want to overstate things but I would say -- I'd say both.

24       I mean, there was evidence presented by Agent Larson, I

25   believe, that Mr. Beals had gone to an attorney's house.  I
```

1    think -- I think, I'm not positive, but I think it was Neil

2    Crist in that situation many, many years ago.  I'm not positive

3    but I believe Neil Crist had said that he had -- Mr. Beals had

4    come to his house and made a threat to his wife, I believe.

5    I'm not positive but I believe that's the situation.

6        So -- but, you know, getting back to my argument, I think

7    the weight of the evidence does favor the government that we

8    can prove it.

9        You know, I don't know if the court wants to hear --

10   Mr. Laber raised the Elonis case from the Supreme Court, and

11   some of the -- and the White case that came after it in the

12   Fourth Circuit and what the standards are.  I can go into that

13   if there's -- if Your Honor feels it would be helpful to kind

14   of explain the standards.  But --

15         THE COURT:  No, I'm fine with that.  And I guess, do

16   you have any more information than is in the pretrial/

17   presentence report on the extortion conviction as well as the

18   interstate threat conviction?  'Cause I know they're old, but

19   it's something I'm interested in in terms of what led to those.

20         MR. LIZANO:  That -- the extortion conviction, I

21   believe it stemmed -- I believe it essentially was an

22   interstate threats by extortion type of conviction.  So they're

23   both interstate threats cases.  That's my understanding of it.

24       In terms of what spawned it, you know, why, you know, he

25   sent those emails, that, I don't have any information on at

UNITED STATES DISTRICT COURT

1    this point.

2              THE COURT:  Okay.

3              MR. LIZANO:  So -- but, I mean, I'm assuming it has

4    all to do with this view that he holds that he's a victim of a

5    conspiracy that he's trying to --

6              THE COURT:  Well, the only reason I bring that up is

7    that the extortion conviction comes up before any of the Utah

8    incidents, if I'm reading the presentence report correctly.

9              MR. LIZANO:  Right.

10             THE COURT:  So I was interested in that but maybe we

11   can --

12             MR. LIZANO:  And I believe the extortion conviction --

13   I mean, it's a little bit maybe of a misnomer to label it as

14   extortion period without putting the qualifier that it also had

15   to do with interstate threats because I believe it had to do

16   with extorting somebody via interstate threats, like it was the

17   same type of offense as what he was later convicted of in 1995,

18   I believe.

19             THE COURT:  Okay.

20             MR. LIZANO:  So, for what it's worth, the government

21   believes that the weight of the evidence supports detention as

22   well.

23         So then you move on to the history and characteristics of

24   the person, and obviously this is where the meat of this whole

25   issue is.  You know, one of the things I point out, just to

1    highlight for the court, from Exhibits 7 and 6, which are the

2    forensic examinations, you know, both of those basically noted

3    that the testing showed -- the first one, Exhibit 7, noted on

4    page 4, the testing showed Mr. Beals to have poor emotional

5    controls.  As he becomes more anxious or threatened, his

6    impulse control deteriorates.  On page 7 of that, Exhibit 7, it

7    says his ability to significantly alter his long-term behavior

8    is questionable.  It is predicted that he will return to his

9    earlier behavior.  That's on page 7 of that -- of Exhibit 7.

10        And in Exhibit 6, which is the 1995 forensic evaluation, he

11   essentially was diagnosed with an impulse control disorder.

12   Statements in there to the effect of Mr. Beals appeared to have

13   several discrete episodes of failure to resist aggressive

14   impulses that resulted in threatening to harm others.  The

15   degree of aggressiveness expressed is grossly out of proportion

16   to any objective precipitating psychosocial stressors.  That's

17   on page 8 of Exhibit 6.  And then on page 9 they use the phrase

18   "intermittent emotional explosions".

19        You know, and that kind of leads into another point.  Not

20   only has Mr. Beals been diagnosed with these impulse control

21   disorders in the past, but I think it's fair to say that there

22   are serious questions about his mental stability currently.

23   And I don't think even -- I don't think Mr. Laber would

24   dispute, you know, before we probably proceed with even a

25   guilty plea or go to trial that we would want to get Mr. Beals

1    evaluated.  I mean, I'll let Mr. Laber speak to that but I

2    would assume that he would want to have that done in order to

3    assure everybody that Mr. Beals is competent to proceed with

4    this case.

5        And, you know, if that's the situation, Your Honor, where

6    we have an individual whose mental stability is so much in

7    question, I really question the wisdom of allowing this

8    individual to be released, even on conditions such as an ankle

9    monitor or curfew at home.  I think that's what pretrial was

10   recommending.

11       You know, I mean, I had a case, I'll just be honest, this

12   morning, where another individual, totally different type of

13   case, but a motion for competency exam was filed, and detention

14   was stipulated to until the evaluation could be completed.  I

15   mean, I think that would be a very safe course to follow rather

16   than allowing a person who is serious -- where there's serious

17   and significant questions about his mental status to just be

18   let out on conditions.

19       So, another of the factors that's wrapped up in the

20   analysis is the defendant's past conduct and criminal history.

21   Obviously he has a lengthy history of sending threats and

22   sending harassing communications.  He's been convicted of the

23   same thing beforehand.  He's had a demonstrated disregard, Your

24   Honor, of court orders, and the conditions that are imposed in

25   connection with his probation.

UNITED STATES DISTRICT COURT

1    You know, the findings of fact from the -- from one of the

2    court cases which I believe is -- I believe is Exhibit 5, that

3    one refers to three probation violations, one of which where he

4    was discovered with firearms at his home.  And, again, it's

5    old, but he was discovered with firearms at his home.

6        Another violation, you know, according to this -- the

7    factual findings referred to Beals' retaliating against a

8    federal official by threatening a family member of that

9    official.  And then obviously Exhibit 5 describes the threat

10   that was made in that case that was charged in that case.  I'm

11   not going to read it into the record because I think that one's

12   extremely over the top vulgar but it's paragraph 16 of

13   Exhibit 5.

14       I already referred to the "F Judge Alba" comment that he

15   made during his interview with the FBI.  Agent Larson testified

16   to the fact that Mr. Beals was -- had been held in contempt, I

17   think -- I think the testimony was 22 times during the divorce

18   proceedings that Mr. Beals had in the past.  The FBI agents

19   again told him not to send the emails.  He told the FBI agents

20   that he's going continue to send emails.  He believes it's his

21   First Amendment right to do so and he's just going to keep

22   doing it.  And, in fact, he did do it in August of, you know,

23   2016, he sends the email to judge -- to Judge Jenkins

24   containing that threat about still wanting to "Shoot you Mormon

25   MF'ers".

1     So, you know, there's no reason to believe that if the

2  court tells him, "Wear an ankle monitor, Mr. Beals", or "Don't

3  send any emails, Mr. Beals", that he's going comply at all with

4  that.  You know, I mean, his history is that he's not.  He's

5  simply not going to comply with the court orders.

6     And then the other thing, too, Your Honor, and this kind of

7  dovetails with the mental evaluation part of it, but, you know,

8  we're facing a situation here with a man who has millions of

9  dollars in a trust for himself, you know, who's been able to

10  travel all over the world, to Argentina, to Europe, who owns

11  his own home, and yet he's so fixated on this, you know, and so

12  obsessed with this that, you know, he still continues to send

13  these emails and, to me, and I'm not saying this with any

14  disrespect, but to me this indicates a person who just isn't

15  rational, you know, about -- about the situation that he's

16  facing.

17     You know, I mean, I understand, you know, maybe there was

18  some legitimate basis for his -- for his complaints.  I mean,

19  who knows?  It's very hard to figure out what he's really upset

20  about.  But the point is that we're dealing with a person who's

21  not -- who really isn't thinking rationally about the

22  situation.

23     And, again, the notion that the court would release an

24  individual who has such poor rational reasoning skills, that

25  certainly gives me some pause and I would hope it would give

1    the court some pause as well.

2         So, and again, sending the emails, the government would

3    contend, is in itself, especially if there are additional

4    threats, because the additional threats are crimes of violence,

5    so if he sends additional threats, you know, that's -- that in

6    itself is something that should be considered and there's no

7    reason to believe that he's going stop sending the emails,

8    plain and simple.

9         Now, to the -- maybe the meatier question of whether or not

10   he's going act out on these threats, I think it's fair to say,

11   and Agent Larson testified to this, when you look at the

12   transcript of the interview that he had with them and these

13   ominous statements about what his intentions are, you know:

14   What happens when you get beyond totally fed up?  What are you

15   going to do?  I don't know what I'm going to do.

16        You know, at one point I was thinking -- I was going to say

17   I think the only person in this courtroom who knows what's

18   going to happen is Mr. Beals, but I don't even know if

19   Mr. Beals knows what he would do in a particular situation, if

20   a particular set of circumstances arises, and he basically said

21   as much during his interview with the FBI agents.

22        But the behavior, you know, is just getting, I would say,

23   worse and worse and worse.  And, you know, one of the

24   statements that he made, which was particularly troubling, and

25   I think rightly so, is that, you know, it's not in his best

interests at this point to harm somebody.  He said that in

January 2016.  So I guess that begs the question of what is,

you know, the breaking point for this person who's been

diagnosed with an impulse control disorder?  Is it going to be

the indictment?  Is it going to be the arrest on the

indictment?  Is it going to be the loss of his direct access to

trust funds now that Ms. Waldron is now in charge of his trust?

Is it going to be, you know, finding out that what he perceives

to be a terminal illness, is that's what's going to set him off

and make him decide that now it's in his best interests to go

ahead and seek justice for himself?

You know, I mean, I think what's particularly troubling to

the government is when you look at Exhibit 8, which is the

email that he sent only to Mr. Furner, his, I think fair to

say, his confidante, the person he felt was the only person in

the federal government who was listening to him, the email

where he signs it "Rick" instead of "Richard Beals", and he

tells him, coming on the heels of the threat to Judge Jenkins

or the arguably threatened statement to Judge Jenkins a couple

of days beforehand, you know, you tell Judge Jenkins -- 'cause

remember, Your Honor, the testimony from Mr. Furner was that

Mr. Beals believes that Judge Jenkins, with a stroke of a pen,

can just make all this go away.

So, you know, what happens when you have an individual and,

you know, who believes he's going die, he has a

```
 1    life-threatening illness, and, I mean, what does he have to

 2    lose at this point?  And I think that's very concerning about,

 3    you know, given his past behavior, the types of statements that

 4    he's made, how strongly he believes and what he feels about the

 5    injustices that he believes have been done to him.

 6        I mean, you know the kind of world we live in, Your Honor,

 7    and what we see on the news, you know, about what can happen.

 8    And I just don't -- I just don't think -- I don't see a reason,

 9    especially where the government is willing to accommodate his

10    health concerns and deal with those so that he can get the

11    treatment that he needs, to take the risk of letting an

12    individual out with known mental health issues who has stated

13    that he wants to kill people and it's just not in his interest

14    at this point.  That's -- that's really the nub of the

15    government's argument, Your Honor.  And that's why we're so

16    concerned about what might happen.

17            And, again, we don't have to -- it's not like we have

18    to show that there's a certainty that he's going go out and do

19    this.  Nobody knows what's going to happen.  But certainly his

20    behavior is very disturbing and very alarming and the

21    statements that he has made should give everybody pause about

22    allowing him to go out in the world, even under some conditions

23    like with an ankle monitoring bracelet or something like that.

24            And in terms of his capability of carrying out the

25    threats, you know, I think there's been testimony about how he
```

has the tumor in his sinuses and, you know, his health, I
believe, his health seems to be deteriorating, and I believe
Ms. Waldron spoke about that a little bit.  But certainly, Your
Honor, this is a man who is capable of carrying out these types
of threats.  He traveled -- we know from the interview with the
FBI agents he traveled to Montana through Utah in April of
2015.  There's been travels to Europe recently.  There's been
travels to Argentina several times a year, I believe four times
a year is what came out.  You know, again, Larson testified
about the fact that many decades ago he actually did go to Utah
and go to somebody's house.

So we're not dealing with somebody who's incapable of
carrying out a threat and, you know, in terms of whether or not
there are firearms at his house or not, the court well knows
that a person can stash firearms, money in a multitude of
places.

And in touching upon the money part of it, the trustee, the
proffer that was made by the trustee or on behalf of the trust
-- I'm sorry, the trust lawyer was that he's not really sure
whether or not Mr. Beals has stashed money away somewhere.  He
doesn't know if he, the trust and estate lawyer, knows of all
of Mr. Beals' assets.  So it's certainly entirely possible that
there could be means still available.  Even though Ms. Waldron
is going to be serving as the trustee over, you know, the
trustee of his trust, there's still opportunity for him to

1    access money and potentially firearms if they're available.

2          THE COURT:  Just slow down.  I think I understand your

3    position, and you're certainly free to file something and I'm

4    not trying to cut you off but I did have two questions.

5          MR. LIZANO:  Sure, yeah.

6          THE COURT:  And I want to let Mr. Laber argue and I

7    know the marshals have a schedule for the bus, but is the -- I

8    mean, Mr. Beals has admittedly been doing this for years,

9    sending these threatening emails.  What was the tip of the

10   iceberg or, I guess, was it the email to Judge Jenkins and/or

11   the email to his probation officer that raised the kind of the

12   alarm that something's different now?

13         MR. LIZANO:  No, Your Honor.  I mean, we had been --

14   we'd been investigating the case for quite some time so --

15         THE COURT:  So it was just kind of fortuitous?  I

16   mean, those didn't trigger the charging decision necessarily,

17   the email to Judge Jenkins or the email to the probation

18   officer?

19         MR. LIZANO:  Right, right.  We had been looking at

20   this for some time.

21         THE COURT:  Okay.  And then let me just ask you, given

22   that Mr. Beals' threats are to specific people or at least

23   people within Utah, I guess -- and the email threats that he

24   sent, the email threats, his computer is monitored and he sends

25   a threat, he gets arrested, he spends his time in custody.  If

UNITED STATES DISTRICT COURT

1   he cuts off the ankle monitor or does something where that

2   monitor goes off, this isn't like a case where Mr. Beals is a

3   danger to the community here in Tucson, for instance, or a

4   threat to the community in Tucson where anybody he could come

5   into contact with may be at risk.  It's these -- couldn't the

6   government just alert the people on this recipient list?

7              MR. LIZANO:  You know, I would disagree respectfully

8   with that characterization, Your Honor, because I think the

9   tenor of the emails is that he believes, and I think the

10  testimony from, I can't remember who it was now, but I believe,

11  you know, the evidence itself, when you just read the emails,

12  he believes that he's a victim of conspiracy by the Mormon

13  church.  So he has an extremely strong disdain and hatred for

14  Mormon people.  I mean, I think that's very fair to say.  And

15  there is a Mormon community obviously here in Tucson.

16      And so, you know, again, the concern isn't just about --

17  the government's concern is not solely related to a specific

18  victim who he believes may have wronged him but it is larger

19  because he, himself, has said that it's the entire Mormon

20  church that has victimized him so that he believes it's part of

21  this conspiracy to harm him.

22      So, to me, it seems like he believes that all Mormons are

23  involved in this and I think he actually even -- Mr. Furner,

24  you know, alluded to that in his testimony.  I don't know if he

25  said that explicitly but that's kind of what I picked up on it,

1  that both because Mr. Furner works for the government and,

2  again, he didn't testify to it, but I'm assuming it kind of

3  came out that Mr. Furner is Mormon as well.

4      So -- anyway, I -- so I wouldn't agree with that

5  characterization, Your Honor, no.  I think his hatred stems --

6  you know, reaches a lot of different people and not just the

7  specific victims.

8           THE COURT:  Okay.  Thank you.  No, I appreciate that

9  response.  It's helpful.

10           MR. LIZANO:  Right.  And can I make just one final

11  point?

12           THE COURT:  Yes, yes.

13           MR. LIZANO:  We did not address it.  It's the

14  secondary argument but it's the risk of flight argument and

15  again the standard is lower, it's the preponderance of evidence

16  standard.  But the evidence is such that Mr. Beals does have a

17  significant or at least did before the money was sent into

18  trust, into the successor trustee, but significant funds

19  available at his disposal and has been able to travel and has

20  ties to Argentina.

21      And then I would question the lack of any meaningful ties

22  to Arizona.  I mean, he does know Ms. Waldron and Mr. McRee,

23  but in terms of having family members here, I don't know if

24  there's any reason to believe that he would stay, 'cause he can

25  certainly send emails from Argentina, couldn't he?

1    So, anyway, so, unless Your Honor has other questions, I'll

2    submit on that for now.

3         THE COURT:  Okay.  Thank you, Mr. Lizano.

4    Mr. Laber?

5         MR. LABER:  Thank you, Your Honor.  US Supreme Court,

6    United States versus Salerno, the government must prove by

7    clear and convincing evidence that an arrestee presents an

8    identified and articulable threat to an individual or the

9    community.

10    I'll be the first to admit that after 30 years of this I

11    haven't looked at the statute as much as I should and I know

12    that a lot of us come in here and don't go through the

13    requirements methodically, and that's what the government is

14    suggesting that we do today, which is throw everything on the

15    table and see if this passes the smell test.  And the test

16    today might be different than what the test is tomorrow.

17    There are actually standards.  So, the argument -- the

18    argument that the government is making is this is a crime of

19    violence so that, in and of itself, should give everyone pause

20    to say he's a violent person.  I mentioned this in my

21    memorandum.  It is a crime of violence because there's a

22    threat.  But there is not any facts to suggest actual violence,

23    not today, not yesterday, not last year, not 20 years ago.

24    We have someone who is fixated on writing obnoxious emails.

25    There's nothing, nothing that they have suggested that he is

1    violent.  And so this is a -- this is a false equivalent, this

2    is a false construct by saying, well, this particular statute,

3    because it's part of this other statute that has extortion and

4    kidnapping and everything else, it's in the same category, and

5    it is not.

6        When the government says, well, he's got a lot of money, he

7    could -- he could buy some guns.  He's got a lot of money, he

8    could go to Argentina and write emails.  This is the most

9    amorphous argument that, if you're not careful and not

10   critical, it goes along, gosh, you know, that might be true.

11   But it doesn't answer the question:  What is the articulable

12   threat?  What is the identifiable threat?

13       And when Your Honor said, what about these people, these

14   particular people that are in these emails that are mentioned,

15   you said how -- what do they feel about it?  And the answer was

16   similar to what I see on TV at night in the political season,

17   it says, well, don't know exactly but just generally

18   everybody's very concerned about this.  That's not an

19   articulable and identifiable threat.

20       He's lived here for 20 years.  He hasn't shot any Mormons,

21   doesn't indicate that he doesn't like Mormons here.  So the

22   argument that, well, there's a lot of Mormons here in Tucson

23   and they're -- they are in danger, there's no evidence of that.

24   There's no history of that.  There's nothing about that.  So

25   these amorphous arguments are antithetical to what is required

1    under Salerno.  It is amorphous.

2        We start from the premise that there's a presumption of

3    detention.  But the burden of proof has never shifted.  This is

4    simply the burden of production.  The burden of proof is on the

5    government by clear and convincing evidence to go through these

6    various factors and to say this is why.  It's not on the

7    defendant to prove anything.  But he has certainly produced

8    very good evidence from these witnesses who obviously have

9    great confidence in him and have told you other things about

10   his character that flies in the face of this idea that, well,

11   he's just generally a very, very dangerous character.

12       Writing emails, writing threatening emails is against the

13   law.  If this were in the State of Arizona and he hadn't used

14   the wires, I pulled up the statute, and the statute is ARS

15   1312.02.  That's a class 1 misdemeanor for the exact same thing

16   that has happened here.

17       I also find it interesting that when he was convicted in

18   1994, he got six months in prison with time served.  That would

19   suggest that that ended up as a misdemeanor.  I don't know that

20   for a fact, but I'm guessing.

21       Since it's in evidence, and if you look at Judge Fiore's

22   findings, it is the same thing.  He uses vulgarity and he's

23   threatening and he does this and this and that and that.

24   Between 1994 and 2016, that's 22 years, other than the fact

25   that he's said all of these things in emails, he's never acted

1    out, not once, not ever.  Speculation that he might or that he

2    could or that he wants to, that's -- that's not evidence that

3    amounts to clear and convincing evidence, not even a

4    preponderance.

5        These arguments that, well, he's been charged by a grand

6    jury is not evidence.  He wasn't there.  There wasn't any

7    testimony from any of the actual witnesses other than an agent

8    who went in there and said:  Well, we know this.

9        I think it's very telling, Your Honor, that they went to go

10   see him in January to talk about these two incidences, the one

11   when they talked to him in January about one email that

12   happened in July of 2015, that's what, that's 17, 16 months

13   ago, 15 months ago, and then one before that.  There's no fire.

14   We'll go talk to him:  Don't send the emails anymore.  What are

15   you trying to do?  He wasn't put under arrest, nothing

16   happened.  And nothing has happened for months.

17       All right.  We have the testimony from Mr. Furner that this

18   latest email, the government would have you believe that he

19   wrote that email to him, Mr. Furner, saying:  I'm really sick.

20   What the government wants you to infer, speculate in the most

21   obscene manner is that he's very sick and says:  You know what?

22   I'm going to die and I need to get up there and settle the

23   score.  That's what I'm going to do.  That's what they want to

24   submit.

25       That's not what Mr. Furner said.  He says:  I got the

impression that he -- that he wanted -- he wanted his name

cleared before he dies.  Who wouldn't?  That's all it is.

You've got 400 emails and, as Your Honor commented, you

know, he walked the walk -- he talked the talk, but he didn't

walk the walk.  He hasn't done anything.

So now we get to the issue of, you know, what are the

various factors?  And you have the transcript, Your Honor, I

put them in my memorandum and, as I indicated, you know, you

can cherry pick through that but you have to look at the entire

-- at the entire transcript to understand what -- what he was

saying or what he wasn't saying.  And I put them in there.  I'm

not going to go through them again other than he says:  No, I

don't want to hurt anybody.  And so the government's saying:

Well, he says he didn't want to hurt anybody but he doesn't

really mean it because we think -- we think he does.  What the

government thinks is not evidence.  What the government fears

just because it's just a generalized fear is not evidence.

The government would have this court believe that because

we can take care of his medical problem, detention is okay,

without any regard to what the effect of detention itself,

regardless of his medical condition, affects both him

personally and his rights.  Detention is a last resort, not a

first resort.

So, he is sick, clearly.  We have testimony -- he rarely

travels very far from home.  We have two very, very upstanding

people in the community who know him well, are standing up for

him, are willing to put up their own funds for him, are willing

to watch him and turn him in if he does anything.  Are there

conditions of release that would guarantee that he's not a

danger?  And Your Honor touched on it.  I mean, if he's in his

house, you take away his computer, that means he sends an email

to somebody that he's not supposed to, that somebody's going to

call and he's going in and he's not getting out.  And if he

does that, then he's just stupid.  But I don't think that's

going to happen.

    So if he's got -- if he has an ankle monitor on or a GPS

and he's allowed to go to the store and to his doctor's

appointment, otherwise, he's under house arrest, these are

clearly, clearly conditions that will guarantee both his

appearance and that he's not going to commit any -- any email

writing.

            THE COURT:  How do I have any confidence that he's not

going to do this when the FBI told him not to do it and another

judge told him not to do it and he responds with, you know,

profanity?  And I don't think the government's interpretation

of this latest email to the probation officer is that far off

on the three days after he sends the email calling Judge Bruce

Jenkins a dirty mother fucker and that he wants to kill as many

Mormons as possible.  I mean, I think the government's

interpretation of what Mr. Beals meant in that August 29th

1    email is just as fair -- it's just as fair an interpretation as

2    that Mr. Beals says I'm dying and clear my name and that.

3              MR. LABER:  Well, I understand that, Your Honor, but

4    taken in context, when that is just the latest of four or five

5    hundred emails and, you know, we can say for sure that he's

6    been writing these emails.  That's what he does, he writes

7    emails.  And I'm not suggesting that writing emails is

8    something that, in this case, is appropriate or the emails he

9    writes is appropriate.  They are not.  They are illegal.  They

10   are not -- even though it's classified as a crime of violence,

11   there is no violence and there is no history of that.

12             THE COURT:  And I understand that but, I mean, one of

13   the things I have to consider is whether he can comply with

14   court orders.  And he can't stop sending emails.  He sends

15   emails regarding this issue every four to five days over the

16   last five years where he's threatening people.

17             MR. LABER:  Well, he doesn't have Mr. Furner to write

18   anymore, so he's retired.

19             THE COURT:  Well, I'll probably start getting them,

20   which is fine.  But he sends them to so many people I assume

21   they go into spam.

22             MR. LABER:  Well, look, he's -- the whole point is,

23   are there restrictions that -- that can be imposed on him and

24   shouldn't he -- if he is eligible for release and there is no

25   other -- if the concern is he's going write an email, which is

1    not, depending on what's in the email, is an act of violence,

2    writing an email itself or even writing an obnoxious email is

3    not necessarily a crime, but if he writes an email to anyone,

4    that is, if the court orders, "You may not get near a computer

5    and do anything and we're taking the computer out of your

6    house", that's a reasonable restriction that actually prevents

7    him from doing this.

8        And this argument or the answer to Your Honor's question

9    is, suppose he was in here and he is charged with manslaughter

10   because he was driving under the influence and he hurt somebody

11   or he killed somebody.  The question is, well, you know, he's

12   been drinking for the last 20 years, how do we know he's not

13   going to drink?  Well, we don't know.  But if you put a

14   reasonable restriction on him and say:  You cannot drink, you

15   cannot have alcohol.  If -- the first time you have any, any

16   alcohol, you're going in.

17       But what we do know is that what it is that if you think

18   he's going violate, what is that violation going to be?  Well,

19   it's going to be an email, it's not exactly, you know, shooting

20   a gun, not exactly stabbing somebody, not exactly stealing.

21   Fine.  But we're going to know about it, we're going to know

22   about it immediately and he's going back in.

23       And so I think that there are those conditions that can be

24   met and I think that, in fact, that, you know, there's two

25   people here who are willing to -- who stand up and know him and

1    say, you know, that they will, without any doubt, that if they

2    find that he's doing anything he's not supposed to do, they're

3    going to turn him in.  These aren't the kind of people who will

4    say:  Well, I'm not going to do that because I like Mr. Beals.

5    I think that you can hear from their testimony, these are very,

6    very serious people but they want to help him.  And, you know,

7    he's lucky to be in the situation that he has that kind of --

8    has that kind of help.

9        So we submit, Your Honor, that there are conditions of

10   release that would ensure his -- his appearance, and he has no

11   history of not appearing.  I don't know where that comes from.

12   I did find it rather amusing when the government says:  Well,

13   he can go to Argentina and send an email.  Well, if he sends an

14   email from Argentina, I don't think anybody needs to worry too

15   much about him following through with it.  But that was the

16   suggestion.

17       So, with that, Your Honor, I submit the matter and we hope

18   that you will grant him some conditions of release.

19           THE COURT:  Okay.  Thank you, Mr. Laber.

20       I will agree -- I agree with Mr. Laber, Mr. McRee and

21   Ms. Waldron are obviously very credible witnesses and Mr. Beals

22   is very lucky to have them in his life.  However, they have

23   tried to help him in the past and essentially told him to knock

24   it off and he hasn't -- he hasn't listened.

25       And if you end up getting detained, Mr. Beals, it's 'cause

```
 1    you talked yourself into it.  You talked me into it with your

 2    emails.  But I need to go back, I need to review the exhibits

 3    in more detail, along with the FBI interview.  It would help me

 4    a lot if I could find out some details about the extortion

 5    conviction and the other interstate threats conviction.  If

 6    anybody's able to get me anything on that, submit that within a

 7    week from today.  If you all -- if I didn't give either of you

 8    all enough time to talk and you want to submit anything

 9    additional in writing, feel free to do that.  Mr. Laber did

10    that in advance of the hearing but if there's anything you want

11    to add based on the evidence today, do that within a week of

12    today as well.  And I'm -- I'll get out an order relatively

13    soon.

14              MR. LIZANO:  May I mention just one thing, Your Honor?

15              THE COURT:  Yeah.

16              MR. LIZANO:  Because Mr. Laber alluded to it, just

17    about the, where there's a presumption of detention in the case

18    and he spoke about whether or not that shifts the burden to

19    produce evidence and not the ultimate burden to prove on.  I

20    actually went through the statute, Your Honor, and I don't

21    think, just to be totally candid, that there is a presumption

22    of detention in the case.  I don't think the statute actually

23    imposes one in this particular case, so I just wanted to make

24    that clear right now.

25              THE COURT:  Yeah, I looked at that before our first
```

```
1   detention hearing and I wasn't quite clear on that as well.
2   Obviously, if the presumption applies, Mr. Laber would have to
3   rebut that presumption.  However, I think that the testimony of
4   the two witnesses that I referred to earlier probably rebutted
5   that presumption.  But it remains, if it exists, and I'll
6   confirm whether it exists, that remains as an evidentiary
7   finding for me to consider.  But I'll take a look at that and
8   then if you all want to address that in any pleadings, that's
9   fine.  I'm not encouraging you to file pleadings but you're
10  certainly free to in the next week.
11          MR. LABER:  I gave you 13 pages, I think that's
12  enough.
13          THE COURT:  Okay.
14          MR. LABER:  I am very concerned about his medical
15  condition.  I don't know what Your Honor can do about it, I
16  mean, if we're going to bump it up a week.  You did hear
17  testimony of that, that it's quite serious.  And the government
18  said that they can take care of it.  I think that the
19  government, you know, during the next few days should start
20  making arrangements to have him taken to a doctor and do
21  whatever they need to do.
22          THE COURT:  Yeah, I don't disagree with that.  I think
23  that he needs to see a doctor at CCA as soon as possible.  I
24  don't know how you would do this, Mr. Logalbo (sic), but if you
25  can work it out where the marshals will transport him to
```

```
 1    medical appointments, I think that should be done.  How do you
 2    plan to do that?  To me, that seems like you're going to pull a
 3    rabbit out of the hat with the -- but --
 4              MR. LIZANO:  Well, I mean, I was analogizing it to the
 5    situations where the court orders, for example, individuals
 6    need to be transported out of custody for a mental competency
 7    evaluation where the marshals will take them and then return
 8    them once the evaluation, you know, is complete.  I think that
 9    happens with some frequency, at least on that side of things.
10    I know surgery is a little bit different but that's -- that's
11    something that I think can be worked out.
12              THE COURT:  Okay.
13              MR. LABER:  I don't think that's good enough.  The
14    government has said:  We can detain him and we will take care
15    of this problem, we can take care of this problem for him.  And
16    now saying:  Well, we think we can, I don't really know how
17    we're going to do it, and when it gets done, it gets done.
18    This isn't something that, you know, they should be waiting two
19    or three or four weeks, you know, to figure out.  They make a
20    representation that they can do this, then I'd ask that the
21    court order that he be taken to the doctor by the marshals and
22    have the US attorney make those arrangements within the next
23    week.
24              THE COURT:  Which doctor, his doctor?
25              MR. LABER:  The good doctor, yeah, his doctor.
```

```
 1              THE COURT:  Okay.  Does he have an appointment set up?

 2              MR. LABER:  I will -- we will make an appointment and

 3    we can do this, Karol can do this, she has medical power of

 4    attorney.  We'll make an appointment as soon as possible.

 5              THE COURT:  You make an appointment.  I'll issue an

 6    order that the marshals transport him to the doctor if he's not

 7    released by then, okay?

 8              MR. LABER:  Okay.

 9              THE COURT:  Whether that gets done or whether I get a

10    call from the marshals saying what the hell are you doing, I'll

11    work it out.  But I know it's done in certain instances but,

12    like you said, the mental competency stuff, so --

13              MR. LABER:  What I would like to do, depending on what

14    Your Honor wants, you know, when we get the appointment, I

15    would just like to send it to you and send it to counsel, you

16    know, either I'll do it formally through ECF but then I would

17    -- I think I'd like to call chambers and let you know it's

18    there so you can move quickly.

19              THE COURT:  That's fine, that's fine.  And then we'll

20    just get the order in.  So, okay.  I'm going to take this under

21    advisement.  I know the marshals need Mr. Beals to go with

22    them.  So thank you folks for being here and I'll get an order

23    out relatively soon.

24              MR. LABER:  Thank you for all your time, Your Honor.

25         (Whereupon, the matter was concluded at 4:31 p.m.)
```

1                    C E R T I F I C A T E

2

3

4          I, Cindy J. Shearman, court-approved transcriber,

5    certify that the foregoing is a correct transcript from the

6    official digital sound recording of the proceedings in the

7    above-entitled matter.

8

9

10    __s/Cindy J. Shearman_____        September 20, 2016
      Cindy J. Shearman, RDR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25