JOHN S. LEONARDO
United States Attorney
District of Arizona
CHRISTOPHER A. BROWN
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: christopher.brown7@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR 16-1663-TUC-JGZ(EJM) |
|---|---|
| Plaintiff, | |
| v. | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GOVERNMENT'S APPEAL FROM MAGISTRATE JUDGE'S RELEASE ORDER AND STAY OF DEFENDANT'S RELEASE |
| Richard Corrie Beals, | |
| Defendant. | |

Plaintiff, United States of America, by and through its undersigned attorneys, submits its Memorandum of Points and Authorities in Support of Government's Appeal from Magistrate Judge's Release Order. On September 23, 2016, Magistrate Judge Eric J. Markovich filed an Order releasing Defendant on a cash bond and certain conditions. [Doc. 33.] On that same day, the Government filed the Government's Appeal from Magistrate Judge's Release Order and Stay of Defendant's Release. [Doc. 34.] On September 26, 2016, this Court filed an Order staying Defendant's release and setting the appeal for a hearing on October 4, 2016. [Doc. 35.]

## I.    Summary of Argument.

The Defendant should be detained pending trial because the Government has demonstrated by clear and convincing evidence that Defendant, with a known, lengthy history of mental illness, including a diagnosis of Impulse Control Disorder, poses a danger to the community where he has continued to send threatening, intimidating, and harassing

e-mails despite repeated warnings or admonishments to stop by both judges and law enforcement officials, and because Defendant has recently suggested and implied that he may act out on his threats to "shoot" and "kill" his victims, including a federal judge, a high-ranking Department of Justice official, and members of the Mormon Church, and no condition or combination of conditions will reasonably assure the safety of the community.

## II.  **Facts.**

The following summary of facts weighs heavily in favor of the position that Defendant poses an irremediable danger to the community in this case, and that he should be detained pending trial:

(1)  Defendant is charged in a two-count indictment with transmitting communications containing a threat to "shoot" certain Mormons, including a federal judge and a high ranking Department of Justice official, and a threat to "kill" a private citizen in Utah, in violation of 18 U.S.C. § 875(c).  [Doc. 3.]

(2)  Defendant has two prior felony convictions for Communication of Threats, in 1988[1] and 1995.  [Doc. 12 at 3-4.]

(3)  For nearly thirty years, Defendant has harassed and threatened United States District Court Judges, Assistant U.S. Attorneys, and various other lawyers and private individuals, and he has communicated such a threat as recently as August of 2016.  (Ex. 1-5.)[2]

_____

[1]  The Magistrate Judge correctly notes that a 1995 Order of Detention and Judge's Findings, (Ex. 5), indicates that Defendant's 1988 threats conviction occurred in the District of Arizona.  [Doc. 33 at 6.]  The initial Pretrial Services Report also implies that the 1988 conviction occurred in the District of Arizona. [Doc.33 at 5, citing Doc. 12 at 3.]  The Government, however, believes that Defendant's 1988 threats conviction occurred in the District of Utah, and that his probationary supervision was transferred shortly thereafter to the District of Arizona.  (*See* Ex. 7 at 1, 3.)  The conclusion that the 1988 conviction occurred in the District of Utah appears consistent with other records in possession of the Government, and we anticipate being able to further clarify the matter at the hearing.

[2]  Citations to "Ex." Followed by a number or letter are to the exhibits admitted into evidence at the detention hearing.  Citations to "9/9/16 Tr." and "9/14/16 Tr." followed by a page number are to the transcripts of the testimony presented at the dangerousness hearing.

(4)  Defendant's anger and animosity toward some of his victims stems from his perceived belief that, in the early to mid-1980s, each played a part in cheating him out of his investment in a company called Thermal System, Inc.  (Ex. 7 at 3).  The Defendant also believes that government officials, including federal prosecutors and a district court judge, "framed" him during his prosecution and conviction for Communication of Threats in 1988.  (Ex. 1-3; Ex. 7 at 2-3.)

(5)  In 1989, in connection with a probation violation here in the District of Arizona, the United States Marshal's Service found three weapons at Defendant's home, although the evidence was suppressed and no conviction resulted.  (Ex. 5.)

(6)  In 1991, a probation violation was filed alleging that the Defendant retaliated against a federal official by threatening a family member.  (*Id.*)

(7)  Defendant has a history of communicating vile threats to women and children, including threats to cut out a female's private parts, and a threat to a minor child that he would ". . .shoot as many of [the attorney's] kids as I can . . ." (*Id.*)

(8)   In 2009 or 2010, a federal judge who has been a target of Defendant's threatening e-mail communications, asked a Supervisory Probation Officer at the time, Mr. James Furner, to communicate with Mr. Beals to determine whether any of Mr. Beals's "emails represent a threat to anybody or if he was on his way to Utah to potentially visit the judge or do harm to the judge or any court employee." (9/14/16 Tr. at 5-8.)  Mr. Furner was routinely copied on the harassing and threatening e-mails, and all but one of the e-mails had large recipient lists.  (9/14/16 Tr. at 8, 12-13, 16, 26, 28.)   Mr. Furner communicated with Defendant until about August of 2016.  (Ex. 8.)

(9)  On July 25, 2014, Defendant sent an e-mail communication from Arizona to Utah containing a threat to kill N.C.  (Ex. 1.)  The e-mail was addressed to T. R., and sent to T. R., N.C., Mr. Furner and numerous others.  (*Id.*)

(10)  On April 29, 2015, Defendant sent an e-mail communication from Arizona to Utah containing a threat to shoot Mormons.  (Ex. 2.)  The e-mail was addressed to J. H., and sent to J. B., Mr. Furner and numerous others.

(11)   In January, 2016, agents interviewed Defendant at his home in Tucson, Arizona, and asked him about the e-mails he had been sending over the last few years.  (Ex. 4.)

(12)  During the interview, Defendant stated that he was pleased that the recipients of his e-mails might have been scared or that they might have believed Defendant would carry out his threats.  (9/14/16 Tr. at 13.)

(13)   Also during the interview, Defendant stated that he was not going to hurt anybody because it was not "in [his] best interests *at this point*"; and when the agent responded "[b]ut maybe someday", Defendant did not dispute the agent's contention, nor did he correct the agent.  (Ex. 4 at 28) (emphasis added.)[3]

(14)  Also during the interview, agents told Defendant to stop sending harassing and threatening e-mails, and Defendant admitted that he has been told by a federal judge to stop sending the e-mails.  (*Id.* at 17, 32.)

(15)  In August, 2016, Defendant was diagnosed with a tumor in his sinus cavity, a medical condition that Defendant believes is "life threatening".  (Ex. 8.)

(16)  On August 26, 2016, five days prior to indictment in this case, Defendant sent an e-mail addressed to a federal judge in Utah, and copied to many others on his usual distribution list, again containing a threat to kill certain Mormons allegedly involved in committing wrongs against Defendant.  (Ex. 3.)

(17)  Three days later, on August 29, 2016, Defendant sent an e-mail, this time only to Mr. Furner.  (Ex. 8.)  In that e-mail, Defendant describes his life threatening medical condition and tells Mr. Furner to "make sure [the judge] knows about this *and soon* . . ." (*Id.*.)  Mr. Furner explained that this e-mail concerned him more than any other because he was the only recipient.  (9/14/16 Tr. at 13) (emphasis added.)

(18)  Defendant has the means and physical ability to travel.  He traveled to Montana fishing (by way of Utah) in 2015, to Europe in July of 2016, and he claims to travel to Argentina four times a year.  (Ex. 4 at 15); [Doc. 12 at 2.]

---

[3] The Magistrate Judge did not include this fact in his summary of the evidence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(19)  Two witnesses testified on behalf of the Defendant: Mr. James McRee and Ms. Carol Waldron.  (9/14/16 Tr. at 44-84).  Both witnesses met Defendant in a social setting and claim to have known him for over twenty years.  (*Id.* at 45-46, 62.)  Both witnesses were copied on most, if not, all of the harassing and threatening e-mails Defendant sent over the past several years.  (*Id.* at 45, 74, 81.)  Both witnesses often delete the e-mails and minimize Defendant's conduct, and Ms. Waldron said that "she does not take any of these e-mails very seriously."  (*Id.* at 48, 54-55, 73-75, 82.)

(20)  Defendant has a history of mental illness including a diagnosis of Impulse Control Disorder.  (Ex. 6-7.)

(21)  Lastly, neither the Government, nor the Defendant, presented any evidence that Defendant has been evaluated for dangerousness or competency since 1995.

**III.    <u>Argument</u>.**

The Government may seek review and revocation of a magistrate judge's release order under 18 U.S.C. § 3145(a)(1).  In conducting the review, the district court should "make its own independent determination whether the magistrate's findings are correct, with no deference. … [T]he ultimate determination of the propriety of detention is also to be decided without deference to the magistrate's ultimate conclusion."  *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

A person facing trial is entitled to release under the least restrictive conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community.  18 U.S.C. § 3142(c); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

In certain cases, however, the government may move for detention.  As the Supreme Court has stated, "The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987) [citing 18 U.S.C. § 3142(f)].  On a motion for pretrial detention, the government bears the burden of showing that the defendant poses a flight risk by a preponderance of the evidence, and that the defendant is a danger to the community by clear and convincing evidence. *Motamedi*, 767 F.2d at 1406-07; 18 U.S.C. § 3142(f)(2)(B).

The Ninth Circuit described the factors a District Court is to consider at a detention hearing:

> Section 3142(g) specifies the various factors that must be considered in determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of the community. 18 U.S.C. § 3142(g). These factors are: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id.; Motamedi*, 767 F.2d at 1407. Of these factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt. *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *Motamedi*, 767 F.2d at 1408.

*United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

## A. <u>Nature and Circumstances of the Offense.</u>

The Magistrate Judge, while recognizing the seriousness of the offenses, focuses only on the fact that Defendant has never acted or attempted to act on any threat, and that Defendant does not have a history of violence. [Doc. 33 at 19.] The Magistrate Judge's focus is too narrow. Transmitting a Communication Containing a Threat to Injure, under 18 U.S.C. § 875(c), is categorized as a crime of violence under the Bail Reform Act because it is an offense that ". . . has as an element of the offense, the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(b)(4)(A); *see also United States v. Petersen*, 557 F. Supp. 1124, 1126 n.1 (E. D. Cal. 2007). Based upon this categorization, communicating threats to injure are themselves acts of violence, and proof that a defendant might use actual force or physical violence is not necessary to show that Defendant is a danger to the community. *See United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) (holding that ". . . danger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Karmann*, 471 F. Supp. 1021, 1022 (C. D. Cal. 1979) (danger to community where a defendant serially files false tax forms and indicates he will continue to do so in defiance of the law).

This factor weighs in favor of a finding that Defendant is a danger to the community.

1

### B. **Weight of the Evidence.**

Here, again, the Magistrate Judge maintained too narrow of a focus when analyzing whether Defendant is a danger to the community: "The Court believes that this risk factor undercuts the government's argument for detention because . . . the defendant never acted on any threat or committed any act of violence." [Doc. 33 at 20.] Again, Defendant committed an act of violence every time he sent an e-mail containing a threat. Defendant has also been diagnosed with an Impulse Control Disorder, and he has repeatedly refused to stop sending the harassing and threatening e-mails, even after he was ordered to stop by a judge, and asked to stop by law enforcement officials.

Moreover, the Government presented strong evidence that Defendant may have reached a point where he is ready to carry out his threats. During his interview with the case agents, Defendant implied that *at some point* it would be in his interests to act out on his threats. Then, three days after he sent an e-mail to a federal judge containing a threat to kill Mormons, and believing he had a life threatening medical condition, Defendant sent a very concerning e-mail only to Mr. Furner suggesting that the federal judge should be warned about Defendant's medical condition.

Lastly, the Government presented strong evidence to support the charges against Defendant in this case.[4] Defendant sent e-mail communications containing threats to shoot and kill identifiable people. Defendant admits to sending the e-mails from his home in Tucson and the e-mails were received by numerous recipients in Utah. Most importantly,

---

[4] The elements of 18 U.S.C. § 875(c) are the following:

1) The defendant knowingly transmitted in interstate commerce an e-mail communication containing a threat to injure a natural person; and
2) The e-mail communication was transmitted for the purpose of issuing a threat, or with knowledge that the e-mail communication would be viewed as a threat.

*Ninth Circuit Model Criminal Jury Instruction 8.47B.* Whether a particular statement may be considered a threat is *not* governed by an objective standard. The mens rea of the crime involved in communicating a threat is established through proof that a defendant makes a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat. *See Elonis v. United States*, 135 S.Ct. 2001 (2015). The defendant need not have had the intent or ability to actually carry out the threat. *Planned Parenthood of the Columbia/Williamette, Inc. v. Coalition of Life Activists*, 290 F.3d 1058, 1076 n. 9 (9th Cir. 2002); *United States v. King* , 122 F. 3d 808, 809 (9th Cir. 1997).

Defendant told agents that he was pleased that the recipients of his communications might have been scared, indicating that he intended to communicate threats or knew that his communications would be perceived as a threats. The Government has strong evidence as to all elements of the offense.

The weight of the evidence demonstrating that Defendant is a danger to the community tips the scale in favor of the Government.

### C. Defendant's History and Characteristics.

Defendant's history of mental illness, and his Impulse Control Disorder diagnosis, are perhaps the most compelling reasons to detain Defendant as a danger to the community. Defendant's impulse control issues seem to be a primary contributor to Defendant's threatening behavior, and the doctors who evaluated Defendant in the 1990s did in fact predict that his Impulse Control Disorder would impact him well into the future. Because it does not appear that Defendant has been evaluated for dangerousness since the 1990s, the Government submits that Defendant should undergo a current mental evaluation before any release is considered.

At first blush, Defendant's ties to the community and serious medical condition seem to weigh in favor of release. However, Defendant's ties to the community would be a more important factor if the Court were only considering whether Defendant is a risk of flight. Defendant's ties to the community are less important when considering whether Defendant is a danger to the community. Secondly, although Defendant has a serious medical condition, the Government has offered a more prudent alternative to outright release in this case. Defendant successfully attended a medical appointment with active GPS monitoring along with the constant supervision of Mr. McRee, and Defendant reported back into custody following the appointment. Defendant will argue that this successful limited release to attend a medical appointment is a reason to release him on conditions pending trial; however, the Government submits that the successful limited release demonstrates that Defendant can remain in custody and still attend medical appointments on strict conditions without issue.

1     Lastly, without commenting at length about the bias and judgment of Mr. McRee

2     and Ms. Waldron, the Government submits that a third-party custodian arrangement is

3     inappropriate in this case.  Both Mr. McRee and Ms. Waldron are employed, and Ms.

4     Waldron spends much of the month traveling.  Unlike the medical appointment, where Mr.

5     McRee was able to actively supervise Defendant throughout the entirety of Defendant's

6     release, Mr. McRee would be unable to similarly supervise the Defendant if Defendant

7     were released pending trial.

8         Due to Defendant's history of mental illness, this factor weighs heavily in favor of

9     detention.

10           **D.  Nature and Seriousness of the Danger to any Person or the Community.**

11         The Magistrate Judge's analysis is again too narrow. As the Government indicated

12     above, Defendant's threatening communications are themselves acts of violence and a

13     danger to the community, and Defendant has a history of ignoring court orders regarding

14     his communication of threats.  Defendant's impulse control problems will likely continue

15     to contribute to Defendant's inability to stop sending the harassing and threatening e-mails.

16     Indeed, the Magistrate Judge himself stated that he would probably start receiving

17     Defendant's e-mails if Defendant were released.  (9/14/16 Tr. at 114.)

18         The Magistrate Judge also undervalues the importance of Defendant's "life

19     threatening" medical condition as a motivating factor to act out on his threats, and much

20     of his analysis is devoted to how Defendant might have been perceived by law enforcement

21     prior to August of 2016.  While Defendant may not have acted out on his threats in the

22     past, the Defendant implied to FBI agents in January, 2016, that it might be in his interests

23     to carry out his threats *at some point*.  Then, two critical things happened in August, 2016,

24     that should cause this Court concern that Defendant might act out on his threats.  First,

25     Defendant was indicted, and that alone could be the trigger for Defendant to carry out his

26     threats.  Second, the Defendant has a tumor in his sinus cavity that he views to be life

27     threatening.  The Magistrate Judge is correct about our view that Defendant's "mind set is

28     that he's dying and 'beyond totally fed up,'" and thus he has no reason not to finally act on

his threats to harm others."  [Doc.  33 at 22]; (9/14/16 Tr. at 102-103).  Indeed, the

Magistrate Judge acknowledged that the Government's interpretation of the August 29 e-mail to Mr. Furner as a warning to the federal judge, among others, is a plausible interpretation.  [Doc. 33 at 23.]

The Government need not prove that Defendant will commit an act of physical violence if released.  The Government need only prove by clear and convincing evidence that Defendant is a danger to any other person and the community, whether that danger is the likelihood that Defendant will send another threatening e-mail, or the real possibility that Defendant will try to shoot or kill someone, and that there are no conditions that could reasonably prevent the dangers.   The Government has demonstrated by clear and convincing evidence that Defendant is a danger to the community.[5]

**IV.   Conclusion.**

The Defendant should be detained pending trial because the Government has demonstrated by clear and convincing evidence that Defendant, with a known, lengthy history of mental illness, including a diagnosis of Impulse Control Disorder, poses a danger to the community where he has continued to send threatening, intimidating, and harassing e-mails despite repeated warnings or admonishments to stop by both judges and law enforcement officials, and because Defendant has recently suggested and implied that he may act out on his threats to "shoot" and "kill" his victims, including a federal judge, a high-ranking Department of Justice official, and members of the Mormon Church, and no condition or combination of conditions will reasonably assure the safety of the community.

//

//

//

//

//

---

[5] The Government submits that, given Defendant's history of impulse control problems, a bond, GPS monitoring and/or a part-time, third-party custodian would not be sufficient conditions to prevent Defendant from either sending more threatening e-mails or acting out on his threats.

Respectfully submitted this 29th day of September, 2016.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/Christopher A. Brown*

CHRISTOPHER A. BROWN
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 29th day of September, 2016, to:

Edward H. Laber, Esq.
Attorney for Mr. Beals

Ms. Cristina Verdugo
US Pretrial Services Officer